UNITED STATES *v.* PADELFORD.

1. Claimants under the Captured and Abandoned Property Act, of March 12th, 1863, are not deprived of the benefits of that act because of aid and comfort *not* voluntarily given by them to the rebellion.

2. But voluntarily executing as surety, through motives of personal friendship to the principals, the official bonds of persons acting as quartermasters or as assistant commissaries in the rebel army, was giving aid and comfort to the rebellion; although the principals, by their appointment to the offices named, escaped active military service, and were enabled to remain at home in the discharge of their offices respectively.

3. Taking possession of a city by the National forces was not, of itself, and without some actual seizure of it in obedience to the orders of the commanding general, a capture, within the meaning of the act, of the cotton which happened to be in the city at the time of the entry of the forces.

4. Hence, where prior to any such seizure an owner of cotton, who, though opposed to the rebellion, had given aid and comfort to it to the extent above-mentioned, but was not within any of the classes excepted by the President's proclamation of December 8th, 1863, and in regard to whose property in the cotton no rights of third persons had intervened—took the oath prescribed by that act and kept it—*Held,* after a seizure and sale of the cotton by the government, that he was entitled to the net proceeds as given to loyal owners under the Abandoned and Captured Property Act. Having been pardoned, his offence, in executing the bonds, could not be imputed to him.

APPEAL from the Court of Claims. That court had found the following case:

That among the citizens of Georgia during the late rebellion was one Edward Padelford. That he never gave any *voluntary* aid or comfort to the late rebellion or to persons engaged therein; but " consistently adhered to the United States," unless the matter of certain special facts constituted in law such aid and comfort. The special facts were these: " In April, 1861, after the breaking out of the rebellion, a subscription for a loan of $15,000,000 to the Confederate government was opened in the city of Savannah, and all

persons were expected and required to subscribe to it who were able to do so, and declarations and threats were publicly made, that all who did not subscribe voluntarily should be made to subscribe. These threats were openly made at the place of subscription, and by persons influential with the populace. Padelford's name was mentioned, his absence was remarked upon, and inquiries were made as to where he was; and it was publicly threatened that if the Marine Bank, of which he was a director, did not subscribe liberally, it should be pulled down. Padelford was informed of these things, and advised to subscribe to the loan because of them, by friends, loyal as well as rebel; and under these threats and the pressure of circumstances stated, he subscribed $5000 to the loan, and declared he did it unwillingly and because of the public excitement, and he sold out the stock he had subscribed for in two weeks after.

"The Marine Bank of the city of Savannah was, in 1861, under the direction of Northern men, and Padelford was one of its most influential directors and largest stockholders. When the other banks of Savannah increased their capital stock, and lent their funds to the aid of the Confederacy by exchanging them for Confederate notes and securities, the Marine Bank objected to doing so, and instead, contracted its business for its own security. This conduct and the known loyalty of many of the directors of the bank subjected it to public odium, and it was nicknamed the Yankee Bank. At the time the subscription to the loan was opened in Savannah the political excitement was at its highest point, and it was, as has been stated, publicly threatened that if the bank did not subscribe liberally it should be pulled down. Under these threats and the pressure of the circumstances stated, the bank subscribed $100,000 to the Confederate loan. This was the least it could subscribe according to its capital; and its refusal to subscribe would have endangered the bank and its directors; but Padelford opposed the loan made, and from that time absented himself for the most part from the meetings of the directors, on the ground that the course of the bank was controlled by outside pressure."

In addition to these facts, the Court of Claims found that Padelford, during the rebellion and prior to October, 1863, "voluntarily executed" as surety three different bonds, conditioned for the performance by the different principals of their duties—one as commissary of the rebel army; one as assistant commissary, and one as assistant quartermaster; that all the principals in these bonds were, and for some years had been, respectively, intimate personal friends of Padelford; that two of the principals were within the terms of the conscription acts pending or in force at the time of the execution of their several bonds, and that by their appointment to office they escaped active military service in the field, and were enabled to remain at their homes in office respectively; and that Padelford was induced to execute the bonds by motives of personal friendship and regard for the several principals.

So far the findings of the court as to the loyalty of Padelford.

An act of July 17th, 1862,* having by its thirteenth section authorized the President at any time thereafter, by proclamation, to extend to persons who might have participated in the rebellion, pardon and amnesty, with such exceptions and at such time, and on such conditions as he might deem expedient for the public welfare, President Lincoln did, by proclamation dated December 8th, 1863,† make known to all persons who had directly or by implication, thus participated, with some exceptions specified, that on their taking a certain oath, the form of which his proclamation set forth, and thenceforth keeping and maintaining it inviolate, "a full pardon was thereby granted to them and each of them, with restoration of *all* rights of property, except as to slaves, and in property cases where rights of third parties shall have intervened."

About a year after this proclamation, that is to say on the 21st December, 1864, the city of Savannah was captured by the government forces under General Sherman; Padelford

---

* 12 Stat. at Large, 592.                    † 13 Id. 737.

and one Mott being owners, at the time, of a large amount of cotton in store there. On the 18th of January, 1865, and, as the Court of Claims found, before any actual seizure or taking possession of the property in question by the military, otherwise than by the capture of the city, Padelford, in due form of law, took and subscribed the oath of amnesty and allegiance to the United States government prescribed by the President's proclamation issued in pursuance of the act; he not having been, as to his person or property, within the exceptions of the proclamation; and he thenceforth complied with all the requirements and conditions named in the act and proclamation, and kept and maintained his oath of allegiance and amnesty inviolate. *After* Padelford thus took the oath, the cotton was taken possession of by the military authorities, and by them turned over to the proper agents of the United States treasury, under whose direction it was transported to New York and sold, and the net proceeds, amounting to $246,277, paid into the treasury of the United States. Padelford and Mott, now, March, 1866, filed a petition in the Court of Claims to have these proceeds; their petition being founded on the act of March 12th, 1863*— entitled " An act to provide for the collection of abandoned property, &c., in insurrectionary districts within the United States," and which provided as follows:

" Any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court (1) of his ownership of said property, (2) of his right to the proceeds thereof, and (3) that he has never given *any* aid or comfort to the present rebellion, receive the residue of such proceeds, after the deduction of any purchase-money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof."

After the petitioners had filed their claim, Congress by an

---

* 12 Stat. at Large, 820.

act of June 25th, 1868,* enacted "that whenever it shall be material in any suit or claim before any court to ascertain whether any person did or did not give any aid or comfort to the late rebellion, the claimant or party asserting the loyalty of such person to the United States, during such rebellion, shall be required to *prove affirmatively* that such person did, during said rebellion, constantly adhere to the United States, and did give no aid or comfort to persons engaged in said rebellion."

The petitioners were permitted to sever in their claim, and to sue severally for their respective interests.   And in the suit of Padelford judgment was rendered in his favor for one-half ($123,138) of the net proceeds of the cotton.   From this judgment the United States appealed.

The view of the court was, as matter of law, that Padelford's conduct prior to the capture of the city, did not constitute the giving of aid or comfort to the rebellion, or to persons engaged in the rebellion within the provisions of the acts of March 12th, 1863, and June 25th, 1868, and did not bar him from recovering in this action the net proceeds of the property in question.   And apparently that if it had, he was entitled to recover, having taken the oath and been loyal afterwards.

*Mr. J. S. Hale, special counsel of the United States:*

1. The Abandoned and Captured Property Act provides that the claimant shall prove "that he has never given *any* aid or comfort to the rebellion."   And the subsequent act, that he shall "prove affirmatively" that he "did during said rebellion consistently adhere to the United States, and did give no aid or comfort to persons engaged in said rebellion."   The findings of the court come short of these requirements.   In each case the words of the statute are carefully chosen, and this prescribed form of words cannot be supplied by the general averment that the claimant did "consistently adhere to the United States."

---

* § 3, 15 Stat. at Large, 75.

2. The facts found by the court, in regard to the induce-
ments to the claimant for making the contribution of $5000
to the Confederate loan, do not excuse the complainant from
the consequences of his act.   The finding of the court only
amounts, in substance, to the fact that there was popular
enthusiasm and popular clamor in behalf of the subscription
to this loan.   This is not the force, coercion, or putting in
fear which the law recognizes as an excuse for the commis-
sion of an offence, or for the performance of a forbidden act.
Such an act can only be excused on the ground of fear, pro-
ceeding from an immediate and actual danger threatening
the very life of the party.*

The contribution by the Marine Bank of $100,000 to the
Confederate loan is of the same character, and the claimant
is chargeable as a participator in that loan.   He was "one
of its most influential directors and largest stockholders."
It is found by the court below that he opposed the loan, but
not that he persistently and to the end refused to be a party
to it.   On the contrary, his final assent is fully implied.

However this may be, the obligations which the claimant
entered into as surety in the bonds, and by which he aided
to place men in the actual military service of the rebellion,
and to effect and maintain the organization of the rebel
armies, and thereby enable them the more efficiently to
prosecute the war against the United States, certainly af-
forded aid and comfort to the rebellion.   And these acts of
the claimant are found by the court to have been voluntary
acts.   The inducements or motives found not only do not
detract from the voluntary character of the claimant's acts,
but affirm their voluntary character.   It was from motives
of personal friendship to his several principals—the rebel
officers in question—that these acts were done.

3. The taking of the amnesty oath by the claimant, in
January, 1865, after the capture of Savannah, does not re-
lieve him from the disability effected by the statutes.   By

---

* United States v. Vigol, 2 Dallas, 346; United States v. Haskell, 4
Washington's Circuit Court, 402, 406.

*that* capture the *cotton* was captured.   It was the only capture of it that could be made.   The rights of the United States in respect to the property were fixed and vested by it, and no subsequent act of the claimant could operate to revest the title in himself.

The cotton having been captured in fact, the claimant, by his petition, places himself on the distinct issue that he never gave aid or comfort to the rebellion.   The exclusion of the claimants from the Court of Claims, by reason of acts of disloyalty under the statutes, is not in the nature of a penalty which could be remitted by the Executive power of pardon and amnesty.   The statutes in question are not penal statutes.   They do not purport to inflict a penalty or punishment for a crime.   The jurisdiction of the Court of Claims is purely statutory; and when Congress, in providing for claims growing out of the war of the rebellion, deems it just and proper to provide that such claims shall not be entertained by that court, except by those who satisfy the court by proof that they have had no part or lot in the support or prosecution of such rebellion, such a limitation cannot be removed by Executive action.   The power of pardon and amnesty, under the Constitution, or under the act of 1862, is merely to relieve from the penalties of guilt.   "Amnesty" may, perhaps, have a wider effect than pardon, and wipe out the evidence of the fact, so that it could not be alleged and proved by another, to the prejudice of the party amnestied. But here the party claiming the benefit of the jurisdiction of the Court of Claims is required to prove affirmatively the fact that he never did certain acts; to prove it as an historical fact, not a constructive one.   And here the finding of the court below establishes that the actual historical fact is the other way.

*Messrs. Carlisle and McPherson, contra.*

The CHIEF JUSTICE delivered the opinion of the court.

The Captured and Abandoned Property Act of March 12th, 1863, under which the claim in this case was made,

has been frequently under the consideration of the court. In the several cases decided during this term, and especially in the case of *United States* v. *Anderson*,* it has been held to be remedial in its nature, requiring such a liberal construction as will give effect to the beneficent intention of Congress. That intention was that all property captured or found abandoned during the war, after the date of the law, should be turned into money under the direction of the Treasury Department; and that the proceeds should be placed in the treasury, subject to the right of any person preferring a claim against any portion of the property, to have the net proceeds restored to him on proof of his ownership, of his right to the proceeds, and that he never gave any aid or comfort to the rebellion.

A later act, passed since the petition of Padelford was filed in the Court of Claims, requires every claimant under the original act to prove affirmatively that he constantly adhered to the United States during the rebellion, and gave no aid or comfort to persons engaged in it. We do not think that this act changed essentially the nature of the proof required of claimants by the former act. The particular description of proof required by the later act seems to be included in the more general description of the earlier. Questions arising under the act of 1868, therefore, need not be further considered in this connection.

The record exhibits the findings of fact by the Court of Claims and its conclusions of law. Among these findings is one that the petitioner " never gave any voluntary aid or comfort to the late rebellion," . . . unless certain facts, also found, constitute in law such aid and comfort. On the part of the government it is objected to this finding that it is insufficient, because the statute authorizes relief only on proof that no aid or comfort was given. But we think otherwise. It would violate the soundest maxims of interpretation if we were to construe the act so as to deprive claimants of the benefits intended to be given by it because of aid and comfort to the rebellion not voluntarily given.

* *Supra,* 56.

But the court also find that the petitioner executed as surety three official bonds, two of commissaries and one of a quartermaster in the military service of the so-called Confederate States, from motives of personal friendship to the principals. No compulsion is alleged. On the contrary, these acts are found to have been voluntary. We cannot doubt that these facts did constitute aid and comfort to the rebellion within the meaning of the act. The finding of the court, qualified as it was, is a virtual finding that the petitioner did give such aid and comfort. The general facts found of opposition to the rebellion, so far as opposition would be tolerated, and of earnest good will to the National cause, establish, doubtless, a strong claim upon the favorable consideration of Congress; but do not warrant the courts in relaxing, by a forced interpretation, a rule which Congress has established for the guidance of the Court of Claims in passing upon claims to the proceeds of abandoned or captured property.

But, in our judgment, it was not necessary to determine this point in this case.

The Court of Claims, in addition to the facts already referred to, found that the cotton was stored in Savannah at the time of its capture, on the 21st of December, 1864; that one-half belonged to the claimant; and that "afterwards, on the 18th of January, 1865, before any actual seizure or taking possession of the property in question by the military authorities, otherwise than by the capture of the city, the claimant did, in due form of law, take and subscribe the oath of amnesty and allegiance to the United States government prescribed by the President's proclamation of December 8th, 1863, issued in pursuance of the 13th section of the act of Congress, approved July 17th, 1862; that he was not, as to his person or property, within the exceptions of the said proclamation; and that he thenceforth complied with all the requirements and conditions named in the said act and proclamation, and kept and maintained said oath of allegiance and amnesty inviolate." Upon this finding several questions arise.

And, first, was the property of the petitioner captured within the meaning of the act before it was actually seized and taken into military possession?

As early as the 3d of July, 1863, the Secretary of the Treasury, in a circular letter of instructions* addressed to the supervising special agents of the department, charged with the duty of collecting abandoned and captured property under the act of March 12th, 1863, defined captured property as property "which had been seized or taken from hostile possession by the military and naval forces of the United States." This definition must be taken as the interpretation practically given to the act by the department of the government charged with its execution; and we think it correct. In the case of *Mrs. Alexander's Cotton,*† it was determined that cotton, though private property, was a proper subject of capture by the National forces, during the recent civil war. The court regarded this particular species of property as excepted, by its peculiar character and by circumstances, from the general rule of international law which condemns the seizure of the property of private persons not engaged in actual hostilities, though residing in a hostile territory or region. But the case contains no intimation that such property can be considered as captured before actual seizure. The rule, we think, is otherwise. Rights of possession in private property are not disturbed by the capture of a district of country, or of a city or town, until the captor signifies by some declaration or act, and, generally, by actual seizure, his determination to regard a particular description of property as not entitled to the immunity usually conceded in conformity with the humane maxims of public law.

Rights of possession in public property belonging to the hostile organization, or used in actual hostilities, depend on different principles. Such rights are transferred at once to the captor, upon the capture of the place in which the property may be.

The principles just stated in respect to private **property**

---

* Acts, &c., concerning Commercial Intercourse, &c., p. 38.
† 2 Wallace, 404.

may be further illustrated by reference to the case of *The Venice.** That vessel, with a cargo of cotton, was lying in Lake Ponchartrain at the time of the capture of New Orleans, and was, doubtless, within the discretion of the captors, subject to seizure, though private property. But Flag Officer Farragut and Major-General Butler, commanding respectively the naval and military forces of the. Union, thought proper to give distinct assurances, before and after surrender, of safety and protection to the rights of persons and property. And this court held that these assurances expressed the general policy of the government, to respect and enforce those rights, whenever, in any part of the insurgent country, the authority of the National government should be fully re-established. In accordance with these principles, the Venice and her cargo, which were seized, some days after the capture of the city, by a ship of war of the United States, were restored, by the decree of this court, to their private owner.

Applying the principles above stated to the case before us, three propositions seem to be established : (1.) That the cotton of the petitioner was, by the general policy of the government, exempt from capture after the National forces took possession of Savannah.   (2.) That this policy was subject to modification by the government, or by the commanding general, in the exercise of his military discretion. (3.) That the right of possession in private property is not changed, in general, by capture of the place where it happens to be, except upon actual seizure in obedience to the orders of the commanding general.

It appears as matter of fact that the property of the petitioner was not seized until after the 18th of January, 1865. Whether it was then seized in pursuance of any order, either particular or general, emanating from competent military authority, does not appear.   But we may assume that it was.

And, then, the next question in this case is to be considered, namely, what was the condition or status of the peti-

---

* 2 Wallace, 278.

tioner at that time; and how far was the liability of his property to seizure affected by that status or condition?

The findings of the court show clearly enough that the petitioner disapproved of the rebellion; opposed it as far as he thought opposition prudent or safe; and was gratified by the restoration of the National authority. It appears further, that on the 18th of January, 1865, he testified his adhesion to the constitutional government of the Union by taking the oath prescribed by the proclamation of pardon issued by President Lincoln on the 8th of December, 1863;* that he was not within any of the exceptions of the proclamation; and that he has faithfully kept his oath.

This proclamation, if it needed legislative sanction, was fully warranted by the act of July 17th, 1862,† which authorized the President, at any time thereafter, to extend pardon and amnesty to persons who had participated in the rebellion, with such exceptions as he might see fit to make. That the President had power, if not otherwise yet with the sanction of Congress, to grant a general conditional pardon, has not been seriously questioned. And this pardon, by its terms, included restoration of all rights of property except as to slaves and as against the intervening rights of third persons.

Now we have already seen that at the time when the petitioner took the prescribed oath no right of any third party had intervened; for even if it could be admitted that a right of the government derived from capture is an intervening right of a third person within the meaning of the proclamation, it is certain that no such right accrued to the government until actual seizure, which was after the pardon had taken full effect. In the case of *Garland*,‡ this court held the effect of a pardon to be such " that in the eye of the law the offender is as innocent as if he had never committed the offence;" and in the case of *Armstrong's Foundry*,§ we held that the general pardon granted to him relieved him from a

---

* 13 Stat. at Large, 737.　　　† 12 Stat. at Large, 592, ₰ 18.
‡ 4 Wallace, 380.　　　§ 6 Id. 769.

penalty which he had incurred to the United States.    It fol-
lows that at the time of the seizure of the petitioner's prop-
erty he was purged of whatever offence against the laws of
the United States he had committed by the acts mentioned
in the findings, and relieved from any penalty which he
might have incurred.    It follows further that if the property
had been seized before the oath was taken, the faith of the
government was pledged to its restoration upon the taking
of the oath in good faith.    We cannot doubt that the peti-
tioner's right to the property in question, at the time of the
seizure, was perfect, and that it remains perfect, notwith-
standing the seizure.

But it has been suggested that the property was captured
in fact if not lawfully; and that the proceeds having been
paid into the Treasury of the United States, the petitioner
is without remedy in the Court of Claims unless proof is
made that he gave no aid or comfort to the rebellion.    The
suggestion is ingenious, but we do not think it sound.    The
sufficient answer to it is that after the pardon no offence
connected with the rebellion can be imputed to him.    If, in
other respects, the petitioner made the proof which, under
the act, entitled him to a decree for the proceeds of his prop-
erty, the law makes the proof of pardon a complete substi-
tute for proof that he gave no aid or comfort to the rebel-
lion.    A different construction would, as it seems to us, defeat
the manifest intent of the proclamation and of the act of
Congress which authorized it.    Under the proclamation and
the act, the government is a trustee, holding the proceeds of
the petitioner's property for his benefit; and having been
fully reimbursed for all expenses incurred in that character,
loses nothing by the judgment, which simply awards to the
petitioner what is his own.

These views require the affirmance of the judgment o'
the Court of Claims, and it is

ACCORDINGLY AFFIRMED.