## LAMAR, EXECUTOR, *v.* BROWNE ET AL.

1. The United States, in the enforcement of their constitutional rights against armed insurrection, have all the powers not only of a sovereign, but also of the most favored belligerent. As belligerent, they may by capture enforce their authority; and, as sovereign, by pardon, and restoration to all rights, civil as well as political, recall their revolted citizens to allegiance.

2. Notwithstanding active hostilities had ceased in Georgia, cotton, although private property, seized there by the military forces of the United States, in obedience to an order of the commanding general, during their occupation and actual government of that State, was taken from hostile possession within the meaning of that term, and was, without regard to the *status* of the owner, a legitimate subject of capture.

3. What shall be the subject of capture, as against his enemy, is always within the control of every belligerent. It is the duty of his military forces in the field to seize and hold that which is apparently so subject; leaving the owner to make good his claim, as against the capture, in the appropriate tribunal established for that purpose. In that regard, they occupy on land the same position that naval forces do at sea.

4. Unless restrained by governmental regulations, the capture of movable property on land changes the ownership of it without adjudication. It was authorized by law, in any State or Territory in rebellion against the government of the United States. They (12 Stat. 820) provided as well for the collection of captured or abandoned property as for its conversion into money to be deposited in the national treasury, and allowed the claimant within a prescribed time to sue in the Court of Claims, and to receive the net proceeds, on proof to its satisfaction, of his loyalty, and of his right to them.

5. Neither the captors, nor the special agents of the treasury to whom they delivered the captured property, are liable to the owner thereof in an action at law for any thing by them done within the scope of their delegated powers. Acting for the government, they are protected by its authority; and he must look to it, and not to them, for indemnity.

ERROR to the Circuit Court of the United States for the District of Massachusetts.

*Mr. George T. Curtis* and *Mr. E. N. Dickerson* for the plaintiff in error.

*Mr. Assistant Attorney-General Edwin B. Smith* for the defendants in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This was an action of trover, brought by Lamar, the plaintiff, to recover of the defendants the value of eighteen hundred bales of cotton alleged to have been taken and converted by

them. The defendants justified, as agents of the United States to receive and collect abandoned and captured property, under the several acts of Congress providing therefor. Upon the trial, Lamar introduced evidence tending to show, that, in the years 1861–1864, he stored certain cotton in warehouses in the town of Thomasville, Ga.; that on June 19, 1865, a part of this cotton was his individual property, and stored in his own name, and part was the property of the Importing and Exporting Company of the State of Georgia, and stored in his name as president of the company; that the defendants, in the autumn and December of the year 1865, took and carried the same away, and that the Importing and Exporting Company, though a blockade-running company, had never run any cotton through the blockade, but had, during the rebellion, bought several steamers in England, and brought them into Confederate ports for that purpose. He also gave evidence tending to show, that on Jan. 6, 1865, he, having been in rebellion against the United States, and residing in Georgia during the war, took and subscribed at Savannah the oath of amnesty under the President's proclamation of Dec. 8, 1863, and that this fact was known to the defendant Browne, Sen., shortly after it occurred.

In the course of the trial, William K. Kimball was called three times as a witness, — twice by the defendants, and once by the plaintiff. His testimony disclosed the following facts: Being in the military service of the United States, in Georgia, as colonel of the 12th Maine regiment, he was ordered by General J. M. Brannan, then in command of the first division of the department of Georgia, to Thomasville. He arrived at that place June 19, 1865, and was ordered by his immediate commander, General H. D. Washburn, to take and retain possession of the ordnance, ordnance-stores, quartermaster's stores, commissary-stores, and the cotton in the warehouses there. He was specially directed to seize what was known as "Lamar" cotton. Immediately or within a few days after his arrival, he stationed a guard at the several warehouses in the town in which cotton was stored, so as to control them, and prevent any thing from being removed. At that time there were no armed hostilities at Thomasville, and he was the first to take posses-

sion of the town.  He took no account of the contents of the several warehouses, but, soon after his arrival, called upon the keepers to report the contents to him.  Some did make a report, but others did not.  Some, instead of reporting in writing, brought to him their books for examination.  He continued his guard and the control of the warehouses; and on Aug. 9, 1865, General Brannan, then in command of the district, issued to him the following order: —

<blockquote>
"HEADQUARTERS, DIST. OF SAVANNAH,
"1ST DIVISION, DEPT. OF GEORGIA.
"SAVANNAH, Aug. 9, 1865.
</blockquote>

"COLONEL, —You will turn over to U. S. treasury agent, Mr. A. J. Browne, or such person as he may direct, all cotton and other seized property in the possession of the U. S. troops at Thomasville, or any other point within the limits of your command, except such as you are satisfied belongs to loyal citizens of the United States, who have taken the oath of allegiance, and who do not come under any of the exceptions of the President's proclamation of May 29, 1865.  The cotton and other property claimed by persons whose loyalty you are convinced of  (on sufficient proof of ownership) you will turn over to them.

"I am, colonel, very respectfully, your obedient servant,

<blockquote>
"J. M. BRANNAN,
"*Brevet Maj.-Gen. U. S. Vols., Comd'g Dist.*
</blockquote>

"To Col. W. K. KIMBALL,
   "*Comd'g Sub-Dist. of the Atsamaha.*"

This order was delivered to Colonel Kimball, on or about Aug. 15, by the defendant, Albert G. Browne, Sen., then supervising special agent of the Treasury Department, appointed and acting under the authority of the abandoned and captured property acts.  Upon its receipt, Kimball went with Browne to the warehouses, and turned over the control of both the warehouses and their contents to him, and at the same time executed a written transfer, as follows: —

<blockquote>
"POST THOMASVILLE, GA., Aug. 15, 1865.
</blockquote>

"Having, in obedience to orders of Brevet Brigadier-General H. D. Washburn, taken possession of certain warehouses containing cotton at this post, some of which I had reason to believe was the property of the so-called Confederate States, or of some corpo-

ration authorized by them, in violation of the laws of the United States, or of some individual whose property, by existing laws, is subject to confiscation, I hereby, in obedience to orders of Brevet Major-General Brannan, commanding 1st District of Georgia, turn over and deliver to A. G. Browne, Esq., supervising special agent Treasury Department United States, all of said cotton in my possession, custody, and control at this post, belonging to the State of North Carolina, the State of Georgia, G. B. Lamar, President of the Exporting and Importing Company of Georgia, and to G. B. Lamar, whose property, I am informed, is subject to confiscation, amounting in all to —— bales; to wit, —— bales, supposed to belong to the State of North Carolina; —— bales, supposed to belong to the State of Georgia; —— bales, supposed to be the property of G. B. Lamar, President of the E. and I. Co. of Georgia; and —— bales, supposed to be the property of G. B. Lamar.    I also turn over and deliver to said A. G. Browne, agent as aforesaid, —— lbs. iron, —— lbs. lead, —— lbs. wool, &c., seized as Confederate property at this post.

" William K. Kimball,
" *Col. 12th Maine, Comd'g Post.*"

Contemporaneously with the surrender of the possession and the execution of the transfer by Kimball, Browne executed to him a receipt, as follows: —

" Post of Thomasville, Ga., Aug. 15, 1865.

" Received of Colonel William K. Kimball, commanding post, all the cotton stored in the warehouse of Evans & Parnell, and in the cotton-sheds of J. McKinnon & Co., and in the warehouse of Louis Goldsberry, which belongs to the State of North Carolina, State of Georgia, to G. B. Lamar, President of the Exporting and Importing Company of Georgia, and to G. B. Lamar personally, amounting to —— bales, of the several kinds and marks enumerated in the schedule herewith annexed; also ten bales, supposed to belong to the State of Georgia, in the possession of Judge Grover, at Groversville, Ga.; also fourteen (14) bales in the possession of Mr. Jones, near Groversville, supposed to belong to G. B. Lamar, president as aforesaid.    All of said cotton having been seized by said Kimball as Confederate, captured or abandoned, property subject to confiscation.

" Albert G. Browne,
" *Supervis'g Spec. Agt., Treas. Dept. 5th Spec. Agency.*"

Kimball then detailed Lieutenant Johnson, of his command, to act in connection with Browne and his agents in making a

list of the contents of the warehouses as they were removed. Soon after, Kimball was relieved at Thomasville, and transferred to Savannah, where he took command of the military district. The cotton was afterwards removed to Savannah, and a full and complete detailed invoice made by Browne and Johnson. Subsequently, on Jan. 24, 1866, Kimball executed to Browne another transfer, as follows: —

"SAVANNAH, GA., Jan. 24, 1866.

"Invoice of 1,864 bales of cotton, weighing 928,106 lbs., turned over by the undersigned Aug. 15, 1865, to A. G. Browne, supervising special agent, fifth treasury agency, under orders from Brevet Major-General Brannan, commanding district Savannah ; viz. : —

| | | | |
|---|---|---|---:|
| 1,018 bales, | Importing & Exporting Co., State of Ga. . . . | | 513,799 lbs. |
| 484 | „ | G. B. Lamar, or said Impt. & Exp't'g Co. of Ga. | 246,328 „ |
| 331 | „ | State of North Carolina . . . . . . . . . | 154,403 „ |
| 31 | „ | State of Georgia . . . . . . . . . . . . | 13,576 „ |
| 1,864 | | . . . . . . . . . . . . . . . . . . . | 928,106 „ |

"A written transfer of this cotton in bulk was executed by me to said Browne, Aug. 15, 1865; it being then impossible to invoice it except in bulk, the marks and weights not having then been ascertained.  Said property was situated at and near Thomasville, Ga.

"WILLIAM K. KIMBALL, *Col. 12th Me. Vols.*"

Upon the delivery of this paper, Browne executed to Kimball another receipt, as follows : —

"TREASURY DEPARTMENT, FIFTH SPECIAL AGENCY,<br>"CENTRAL OFFICE,<br><br>"SAVANNAH, GA., Jan. 24, 1866.

"Received on Aug. 15, 1865, from Colonel William K. Kimball, 12th Regiment Maine Volunteer Infantry, one thousand and eighteen bales of cotton, claimed to be property of the Importing and Exporting Company of the State of Georgia; four hundred and eighty-four bales of cotton, claimed to be property either of G. B. Lamar, or of the Importing and Exporting Company of the State of Georgia ; three hundred and thirty-one bales of cotton, claimed to be property of the State of North Carolina ; thirty-one bales of cotton, claimed to be property of the State of Georgia; being a total of 1,864 bales of cotton, marked and weighing as per schedule hereto annexed.  The same having been seized under military orders on June 19, 1865, by the military forces of the United States,

at and near Thomasville, in the State of Georgia, upon the occupation of that region by said troops, and being now turned over by said Kimball, in obedience to orders of Major-General Brannan, U. S. Vols., commanding district of Savannah.

"This property I have received as special agent of the Treasury Department, appointed in pursuance of certain acts of Congress, approved July 13, 1861, May 20, 1862, March 12, 1863, and July 2, 1864. The said property to be transported and disposed of under the regulations of the Secretary of the Treasury, prescribed in pursuance of the authority conferred on him by said acts.

"For this property, a memorandum receipt, without annexed schedules, was given by me to said Kimball on said Aug. 15, 1865; it being then impossible for him to invoice to me said property, except in bulk, the marks and weights not then having been ascertained, and such invoice having now been given by him to me simultaneously herewith.

"ALBERT G. BROWNE, *Supervising Spec. Agent.*"

To each of these last two instruments was attached a schedule or invoice, giving the number, weight, and marks of each bale, classified as standing in the name of the Importing and Exporting Company of the State of Georgia; in the name of G. B. Lamar, or said Importing and Exporting Company; in the name of G. B. Lamar; in the name of the State of North Carolina, and in the name of the State of Georgia, — in all, 1,864 bales.

At the close of the evidence, the circuit judge ruled, that, assuming the testimony of Colonel Kimball to be true, upon the state of facts thereby disclosed, the action could not be sustained, and that this was so irrespectively of all questions relating to the loyalty or disloyalty of the plaintiff, and whether or not he fell within the exceptions of the President's proclamation of Dec. 8, 1863, and also irrespectively of the nature and operation of the Importing and Exporting Company of the State of Georgia. Under this ruling, a verdict was taken by agreement for the defendants; and the plaintiff in due form excepted.

The only error alleged here is upon this ruling.

The case has been argued, on the part of the plaintiff, as though the defendants, in order to relieve themselves from liability to him, must show that the cotton, which is the

subject-matter of the action, was, in fact, enemy property, and subject to capture as such, or abandoned property, within the meaning of the Abandoned and Captured Property Act. The defendants did not themselves seize the property : they received it from the military authorities, who had it in possession after a seizure made by them.

Property is captured on land when seized or taken from hostile possession by the military forces under orders from a commanding officer. *U. S.* v. *Padelford*, 9 Wall. 540; Treasury Regulations, under acts of March 12, 1863, 12 Stat. 820, and July 2, 1864, 13 Stat. 376. The testimony of Kimball shows conclusively that the cotton in question was seized by the military forces of the United States, in obedience to the orders of a commanding general. This is not seriously disputed; but it is contended, that, when seized, it was not in " hostile possession," and that, in consequence, the seizure, though made by the military, did not amount to a capture. It is true, as claimed, that, when the seizure was made, active hostilities in Georgia had entirely ceased. The last organized army of the rebellion east of the Mississippi had surrendered almost two months before, and a very large portion of the national forces had been disbanded. The blockade had been raised, and trade and commercial intercourse in that part of the insurgent territory again authorized; but still, in fact, a state of war existed. That continued until April 2, 1866 (*The Protector*, 12 Wall. 702); the territory within the limits of the State of Georgia being occupied by the national forces, and actually governed by means of that occupation.

From time to time during the war the military lines of the enemy were forced back; and, as they receded, the hostile territory was entered upon by the forces of the United States. It was thus taken out of hostile possession. Whenever, therefore, during this military occupation, enemy property found on the recovered territory was seized by the military forces, in obedience to orders, it was taken from hostile possession within the meaning of that term as used in respect to captures. Property taken on a field of battle is not usually collected until after resistance has ceased; but it is none the less on that account captured property. The larger the field, the longer the time

necessary to make the collection. By the battle, the enemy has been compelled to let go his possession; and the conqueror may proceed with the collection of all hostile property thus brought within his reach, so long as he holds the field. At the time this transaction occurred, the military lines of the enemy east of the Mississippi had been broken up, and its armies in that locality disbanded. Thus the whole of this insurgent territory was uncovered, and this part of the field of the battles of the entire war taken from the hostile possession of the enemy. It was at once occupied by the national forces; and they proceeded immediately to secure the results of the prolonged and stubborn conflict.

That cotton, though private property, was a legitimate subject of capture, is no longer an open question in this court. *U. S.* v. *Anderson*, 2 Wall. 404; *U. S.* v. *Padelford*, 9 Wall. 540; *Haycraft* v. *U. S.*, 22 Wall. 81. It was the foundation on which the hopes of the rebellion were built. It was substantially the only means which the insurgents had of securing influence abroad. In the hands of private owners, it was subject to forced contributions in aid of the common cause. Its exportation through the blockade was a public necessity. Importing and exporting companies were formed for that purpose. It is not too much to say that the life of the Confederacy depended as much upon its cotton as it did upon its men. If they had had no cotton, they would not have had, after the first year or two, the means to support the war. To a very large extent it furnished the munitions of war, and kept the forces in the field. It was, therefore, hostile property, and legitimately the subject of capture in the territory of the enemy.

For the purposes of capture, property found in enemy territory is enemy property, without regard to the *status* of the owner. In war, all residents of enemy country are enemies. Knowing this, but bearing in mind "the humane maxims of the modern law of nations, which exempt private property of non-combatant enemies from capture as booty of war" (*Klein's Case*, 13 Wall. 137), Congress passed the abandoned and captured property acts. 12 Stat. 820. The capture of hostile property was in this way authorized by the United States, even though it should be owned by private persons. The military

authorities were permitted to make their seizures; but careful provision was made for the collection of the property seized, its conversion into money to be deposited in the national treasury, there to remain, according to the ruling in *Klein's Case*, in trust " for those who were by that act declared entitled to the proceeds." Capture for private gain was not permitted. All went to the government.

By this legislation, the Court of Claims is invested with powers as to captures on land somewhat analogous to those possessed by the prize-courts as to captures at sea. Property captured at sea can never be converted by the captor until it has been brought to legal adjudication; and it is his duty, with all practicable despatch, to bring his prize into some convenient port for that purpose. Not so, in general, with regard to movable property on land. There the capture changes the ownership without adjudication, unless restrained by governmental regulations. What shall be the subject of capture, as against his enemy, is always within the control of every belligerent. Whatever he orders is a justification to his followers. He must answer in his political capacity for all his violations of the settled usages of civilized warfare. His subjects stand behind him for protection.

It is quite true that the United States, during the late war, occupied a peculiar position. They were, to borrow the language of one of the counsel for the plaintiff, both " belligerent and constitutional sovereign ; " but, for the enforcement of their constitutional rights against armed insurrection, they had all the powers of the most favored belligerent. They could act both as belligerent and sovereign. As belligerent, they might enforce their authority by capture ; and, as sovereign, they might recall their revolted subjects to allegiance by pardon, and restoration to all rights, civil as well as political. All this they might do when, where, and as they chose. It was a matter entirely within their sovereign discretion.

It was in this spirit that the Abandoned and Captured Property Act was passed. It gave the Court of Claims authority to adjudicate between the belligerent sovereign and the citizen, and to determine the question of capture or no capture. If the owner or claimant appearing there had been loyal, and his suit

was commenced in time, he was entitled to a judgment restoring him to the possession of that which represented his property in the national treasury. The captors were the agents of the government to make the seizure; and the special agents of the treasury, appointed under the act, gathered the product of the captures, and placed the proceeds in the treasury. All acted for the government, and, while acting within the scope of their powers, were protected by its authority. Those aggrieved must look to the government, and not to the agents, for their indemnity. The military forces act in the field according to the laws of war, and seize that which is apparently the subject of capture. They act upon appearances, not upon testimony. They occupy on land the same position that naval forces do at sea. Their duty is to seize and hold, leaving it to the owners to make good their claim, as against the capture, in the appropriate tribunal established for that purpose.

It needs but a moment's reflection to discover the importance of acting upon this theory at the close of the rebellion. Novel questions of public law were then presented, some of which were not easy of solution. An army in the field engaged in making captures could not be expected to stop and decide such questions, and the civil authorities were not in a condition to determine at once the rights of all parties under all circumstances. Hence the necessity for deliberation, and the adoption of measures conducive to that end. Actuated by this feeling, the United States disbanded their armies to a large extent. Only such force was retained as was necessary to occupy and hold the recovered territory, secure the results of the war, and aid in restoring the forms of civil government. The working machinery of the Confederate government was not then in all respects understood. It was not always easy to ascertain what was private property, and what was the public property of the Confederates. Neither was the exact *status* of all the residents of the enemy territory definitely settled. The proclamations of amnesty, and offers of pardon, issued at and before that time, excluded certain classes from their operation. For all the purposes of this case, we must consider the plaintiff as entitled to the benefit of the proclamation of Dec. 8, 1863; but in the consideration of this question we may bear in mind that upon the trial the defendants

offered evidence tending to show that he fell within the exceptions, and that contradictory evidence was submitted by him. Clearly, if there was room for reasonable doubt, the military forces were justified in making the seizure, and thus opening the way for the action of the Court of Claims to settle the controversy. So, too, as to the property itself, or a part of it. As late as Sept. 27, 1865, the government had not given up its claim of title to cotton belonging to exporting and importing companies; for on that day the Secretary of the Treasury issued a circular letter to the government agents, directing them to take charge of all such cotton, and " treat it as property which was used to aid the rebellion, and therefore belonging to the United States." The military forces, therefore, in taking possession of the cotton in controversy, were clearly acting within the general scope of their powers as an army still in possession of enemy territory under orders from their superiors.

At sea, the naval forces ought not to make capture of any thing not lawful prize; but if they do, and the captured property is restored to its owner by the prize-court, the captors are not liable to suit at common law for the trespass. The prize-courts alone have jurisdiction for the redress of such wrongs. This was decided, upon full consideration, as early as 1781, in *Le Caux* v. *Eden*, 2 Doug. 594. The opinion of Mr. Justice Buller, in this case, reviews all the authorities and precedents; and Lord Mansfield declared his assent to all it contained. Subsequently, in *Lindo* v. *Rodney*, reported as a note to *Le Caux* v. *Eden*, p. 612, Lord Mansfield himself gave an opinion upon the same question, in which he asserted the same doctrine with renewed emphasis. The authority of these cases has never been doubted.

Afterwards, in *Elphinstone* v. *Bedreechund*, 1 Knapp, P. C. 316, the same principle was applied to a case of booty in a Continental land war. There the private property of a citizen had been seized on land by the order of the provisional government of the conquered territory established by the military authorities, supposing it to be the property of the hostile sovereign or public moneys. This was done at a time when no active hostilities were being carried on in the immediate neighborhood of the seizure, though the war was not at an end.

The action was in trover, to recover the value of the property taken, against Elphinstone, who had been appointed "sole commissioner for the settlement of the territory conquered, . . . with authority over all the civil and military officers employed in it," and Robertson, who had been appointed by him "provisional collector and magistrate of the city . . . and the adjacent country," and who was, at the time of the seizure, in command of the guards there. The seizure was made under the orders of Robertson, who had been instructed by Elphinstone, among other things, "to deprive the enemy of his resources, and in this and all other points" to make every thing "subservient to the war." Sir James Scarlett, the then Attorney-General, in his argument before the Privy Council, after citing the case of *Le Caux* v. *Eden*, said, "Now, booty taken under the color of military authority falls under the same rule. If property is taken by an officer under the supposition that it is the property of a hostile State, or of individuals, which ought to be confiscated, no municipal court can judge of the propriety or impropriety of the seizure: it can be judged of only by an authority delegated by his majesty, and by his majesty ultimately assisted by your lordships as his council." And Lord Tenterden announced the action of the council in these words: "We think the proper character of the transaction was that of hostile seizure made, if not *flagrante*, yet *nondum cessante bello*, regard being had both to the time, the place, and the person; and consequently that the municipal court had no jurisdiction to adjudge upon the subject, but that, if any thing was done amiss, recourse could only be had to the government for redress." This case is singularly like the one now under consideration, both in its facts and circumstances. Acting upon the principle thus recognized in England, the United States delegated to the Court of Claims the necessary authority for the redress of grievances under such seizures by the military forces. Recourse could be had there by all who had suffered wrongs, if they had been loyal, or, having been disloyal, had been pardoned, and they appeared in time. A direct appeal against the government for the conduct of its armies could be made to a court specially directed to hear and decide upon all such complaints.

We are clearly of the opinion, that, under these circumstances, no action could have been maintained against Colonel Kimball for his acts in the premises. So far as he was concerned, the plaintiff could only look to the United States for redress. Down to this point, the case is nothing more than a capture of movable property on land by the military forces of one belligerent engaged in war with another.

The only remaining question to be determined is, whether these defendants occupy any different position, so far as this action is concerned, from the actual captors. They were the agents of the government, appointed under the authority of law " to receive and collect all . . . captured property." Their duty was to have it disposed of according to the requirements of the law, and to see that the proceeds went into the treasury. If they followed the law after the property came into their hands, they were no more liable to suit by the owners than were the original captors. They were a part of the machinery by which the government executed the trust it assumed at the time of the capture in favor of its loyal citizens. For their guidance, instructions were from time to time issued by the Treasury Department, in connection with the other executive departments of the government. These instructions were specific, and intended as well for the protection of the rights of the owners under the law as those of the government.

It is claimed, however, by the plaintiff, that under an order issued by the Treasury Department, bearing date June 27, 1865, Kimball was not permitted to turn the property over to Browne, and Browne was prohibited from receiving it. We do not so understand this order; for it was expressly provided that it was not to be construed as interfering with the operations of the agents then engaged in receiving or collecting the property recently captured by or surrendered to the forces of the United States, and that those so acting should continue to discharge the duties thus imposed until such property should all be received or satisfactorily accounted for, and until the amount so secured was shipped or otherwise disposed of under the regulations prescribed upon that subject. This property, as we have seen, had been captured by the military forces only a few days before the order was made, and was, therefore, expressly ex-

cepted from its operation. But, if it were not so, it is difficult to see how the plaintiff can complain. His property had been captured, and was in the possession of the military forces when delivered to Browne. General Brannan's order of Aug. 9, 1865, permitted Colonel Kimball, on sufficient proof of ownership, to give up cotton in his hands claimed by persons of whose loyalty he was convinced. It is not, however, claimed that Colonel Kimball knew of the pardon of the plaintiff, or that any demand was made on him for the property. He could not surrender any thing which he had taken and held, except upon sufficient proof of ownership and loyalty. He could not be personally accused of wrongful detention, therefore, until some attempt had been made to convince him of the "sufficient" claim of the owner.

After the cotton came into the hands of the defendants, they, and each of them, were expressly prohibited by the treasury regulations from releasing it, or any part of it, to any person whatever claiming to be the owner, except upon special authority from the Secretary of the Treasury. It was no part of their duty to make application for such authority. Being, therefore, bound to receive all property turned over to them by the military, and prohibited from surrendering it to the owners, except under orders from the Treasury Department, they occupy the same position as to the plaintiff that the military authorities did, and cannot be made liable unless they were before the transfer. It follows, that, in the ruling of the circuit judge complained of, there was no error.

*Judgment affirmed.*

MR. JUSTICE FIELD dissenting.

I am compelled to dissent from the judgment of the majority of the court in this case, for the following reasons : —

1st, The cotton for which the present action was brought was not, in my opinion, either abandoned or captured property within the meaning of those terms as defined by the legislation of Congress, or the circulars and regulations of the Treasury Department. The act of July 2, 1864, in its third section, declares that property " shall be regarded as abandoned when the lawful owner thereof shall be voluntarily absent therefrom,

and engaged, either in arms or otherwise, in aiding or in encouraging the rebellion." The owner here, whether voluntarily absent or not, was not engaged, in arms or otherwise, in aiding or in encouraging the rebellion at the time the cotton was taken: he had, months before, renounced all adhesion to the rebellion, and taken an oath of allegiance to the United States.

Captured property was defined by a circular of the Treasury Department, issued on the 3d of July, 1863, to be "that which has been seized or taken from hostile possession by the military or naval forces of the United States." This definition was repeated in subsequent treasury regulations, and was approved by this court in *Padelford's Case*, 9 Wall. 531. It is there said that this definition must be taken as the interpretation practically given to the act by the department of the government charged with its execution; and the court added, "We think it correct."

The cotton here in controversy was never seized or taken from any hostile possession. It was at the time stored, in the name of the plaintiff, in the warehouse at Thomasville; and, for many months previously, his *status* was that of a loyal citizen of the United States. He had taken, in January, 1865, the oath of amnesty under the President's proclamation of Dec. 8, 1863, by virtue of which a full pardon was extended to him, with "restoration of all rights of property;" and this fact was known to the special agent of the Treasury Department when the cotton was turned over to him.

2d, The defendant Browne had no authority, in my opinion, to meddle, as treasury agent, with the cotton in controversy, after the 30th of June, 1865, assuming it to have been captured or abandoned. The instructions of the Treasury Department, issued by the Secretary on the 27th of that month, directed the treasury agents to refrain, after the 30th of June, from receiving captured or abandoned property from the naval or military authorities, excepting in cases in which they were *then* engaged in receiving or collecting property recently captured or surrendered. The cotton of the plaintiff was not within this exception; for, on the 30th of June, the defendant was not engaged in receiving or collecting it. The command-

ing general did not order it to be turned over to him until the 9th of August, and it was not received by him until the 15th of the month. In receiving it then, he violated, in my judgment, the positive instructions of the department. After the 30th of June, 1865, the duty of receiving captured or abandoned property, not embraced within the exceptions stated, was devolved, by express direction of the Secretary of the Treasury, upon the usual and regular officers of the customs at the several places where they were located.

It is certainly desirable that full protection should be extended to the agents and officers of the Treasury Department, whilst engaged in executing during the war the commands of their superiors within the insurrectionary districts; but it is equally important that protection should not be extended to acts which were not only not authorized, but were expressly forbidden.

It seems to me that the ruling of the majority of the court has carried the principle of protection in this case beyond all former precedents; and that the reasoning of the opinion, in its logical consequences, will justify in many instances the most wanton interference with the private property of citizens.