Nott, J.,
delivered tbe opinion of tbe court:
‘The single question presented by this case is Avhether tbe proceeds, now in tbe Treasury, of cotton Avhich Avas captured anterior to tbe Abandoned or captured property Act (12 Stat. L'., 820) can be recovered under the provisions of that statute.
To some extent this question has been answered by former decisions, Avberein it has been held that tbe Act in-addition, áse., *563 2d July, 1864 (12 Stat. L., 375), carried, back tbe abandoned or captured property act, and gave to it, to- a certain extent, a retroactive effect. But tlie act in addition does not in terms make the abandoned or captured property act retroactive, and shadows of doubt have tallen upon all of the decisions. It purposes merely to extend the authority of the Treasury agents to seize, collect, and receive certain property liable to seizure under the Non-intercourse Act 13th July, 1861 (12 Stat. L., 255, § 5), or liable to confiscation under the Confiscation Act 11th July, 1862 (12 id., 589, § 5).
Hitherto it has seemed inexplicable that Congress apparently extended themereiful and benignant provisions of the abandoned or captured property act to property which, to borrow a phrase from the prize courts, might be termed “delinquent”; that is to say, property which was being carried from one part of the country to another in violation of the non-intercourse act, or property which, belonging to certain designated classes of persons engaged in the rebellion, was liable to confiscation by judicial proceedings under the confiscation act. And it has seemed equally inexplicable that no express provision should have been made for innocent property previously captured; that is to say, for the property of loyal persons which had been seized by the land or naval forces engaged in the suppression of the rebellion. Besearch.es which have been made in the present case and in the recent case of Winchester, however, enable us to clear up this obscurity, and explain satisfactorily the apparent inconsistency of this remedial legislation.
It now appears that an executive system for the collection of abandoned or captured property existed long anterior to the statute of that name (Act 12th March, 1863), and, indeed, began soon after the beginning of the war. This executive system was called into being by the manifest necessity for saving the large quantity of cotton which fell into the hands of the government immediately after the capture of Beaufort in the autumn of 1861. It seems to have been a system devised by the War and Treasury Departments conjointly, and its operation was intrusted jointly to the officers of the one and the agents of the other. The first utterance of the government came from the War Department on the 27th November, 1861, in the form of an order of the Adjutant-Genera! issued to General T. W. Sherman, the commanding officer of the military district around Port Boyal, *564 directing tbe seizure of cotton and other property which might be used by the enemy and its shipment to the quartermaster in New York.
On the 30th November, 1861, a copy of this order was “furnished for the information of the Secretary of the Treasury; ” and on the same day the Secretary prepared “ General regulations relative to securing and disposing of the property found or brought loithin the territory noiv or hereafter occupied by the United States forces in the disloyal StatesAt the same time, and of the same date, he prepared forms for the appointment of Treasury agents to proceed to different places in the South “ to receive and take charge of cotton, rice,” &c.; and also forms for the appointment of agents in Northern ports to receive and take charge of consignments of cotton and other property as it might be forwarded from the South. Those general regulations and forms of appointment were printed by the department and kept ready for use, and it is probable that in one instance at least the regulations were issued to an agent; but it is proper to add that they do not seem to have been issued generally during the year .1861, and perhaps were not issued afterward.
Early in December, 1861, Lieutenant-Colonel Reynolds, an officer of the Army, was ordered by the Adjutant-General to report to the Secretary of the Treasury for special duty, and by the Secretary was appointed agent of the Treasury to collect cotton, rice, and other property in the vicinity of Hilton Head. Instructions were given to him by the Secretary, which were probably the printed regulations and appointment before referred'to, and a copy of these instructions, whatever they were, was transmitted by the Adjutant-General to General Sherman, and he was ordered to turn over property to the agent, and to govern his actions in relation to the collection of abandoned property by the instructions. Pursuant to this order, General Sherman issued directions to the quarter masters to turn over all such property in their custody to the Treasuay agent, and he proceeded to collect and ship it to New York.
On the 31st December, 1861, the Secretary of the Treasury directed Mr. Hiram Barney, the collector of the port of New York, to receive all of the property that might be shipped by Colonel Reynolds. Mr. Barney did so, and acted as the agent of the government in disposing of the property and receiving the proceeds.
*565 Without entering further into the details of this S3stem established by executive authority, it is sufficient to say that it was substantially the same system afterward ascribed to the legislative authority of the abandoned or captured property act; that the officers of the Army turned over captured property to the Treasury agents under military instruction as they afterward did under the requirements of the statute; that the system was maintained in the Port Royal district until June, 1862, during which a large quantity of cotton was seized; and that the net proceeds, amounting to $1,417,821.65, remained in the custody of Collector Barney until after the enactment of the act in addition, 2d July, 1864, and were in November, 1864, and January, 1865, transferred to the Treasury, and in June, 1866, formally “ covered into ” the Treasury.
The authority which the Secretary of the Treasury exercised in establishing this system and collecting this property' he ascribed to the Non-intercourse Act 13th July^ 1861 (12 Stat., L., 255, § 5). In his printed form for the appointment of special agents to collect this property he says: “ With the approbation of the President of the United States and by virtue of the authority vested in the Secretary of the Treasitry by the act 13th July, 1861, 1 hereby appoint you a special agent,” &c.; in his form for the appointment of agents to receive consignments of cotton lie repeated the same preamble; and in an official communication of February 19, 1862, to Mr. Edward L. Pierce, another of these special agents, he said:
“ The whole authority* of this department over the subjects of your report is derived from the 5th section of the ‘Act to provide for the collection of duties, and for other purposes, approved July 13th, 1861, by which the President is authorized to permit commercial intercourse with any part of the country declared to be in a state of insurrection, under such rules and regulations as may be prescribed by the Secretary of the Treasury, who is himself authorized to appoint the officers needed to cany into effect such permits, rules, and regulations. As incidental to this authority alone have I any power to sanction any measures for the culture of the abandoned estates in the Port Royal or any other district. It is, indeed, in the highest degree essential to commercial intercourse with that portion of the country that the abandoned estates be cultivated and the laborers upon them employed. I do not hesitate, therefore, to continue your agency with a view to the general superintendence and direction of such persons as may be engaged in such cultivation and employment.”
*566 It is not our purpose to decide tbat the uon-intercourse act contains the statutory authority which the Secretary of the Treasury ascribed to it; and, on the contrary, we are of the opinion that its provisions were not really applicable to property seized or captured like that around Port Boyal; but, nevertheless, it is clear that the Secretary ascribed his authority to that act, and that the property was as a matter of fact held under color of the act, and so came to be regarded as property seized by virtue and under authority of the statute.
Thus, in 18(54, when the act in addition was passed, there were in the hands of various officers of the government the proceeds of three distinct classes of captured property, viz: property seized nominally under the non-intercourse act, property seized nominally under the confiscation act, and property taken by military capture or collected as abandoned and ascribed.to the authority of the abandoned or captured property act. If the status of the first two classes was kept unchanged, it would sooner or later be necessary to institute judicial proceedings against the property in the one class or against the owners in the other; for confessedly the title of neither had passed to the government by the mere act of seizure under those statutes. Accordingly, the act in addition, dealing with the facts as they were supposed to exist, extended the provisions of'the abandoned or captnred property act to cotton seized under the two pre-existing statutes, and directed, though in a loose and ambiguous manner, that “all moneys” derived from captnred property, after deducting the necessary expenses, “ be paid into the Treasury
In the month of November following the passage of that act, and apparently in obedience to it, the collector of New York paid into the Treasury the money in his hands derived from this Port Boyal and Beaufort cotton. On the part of the Treasury, it was carried to the account of abandoned and captured property; it was twice reported by the Secretary to Congress as forming a portion of the abandoned and captured property fund (House Ex. Doc. No. 97, 39th Cong., 2d sess., 9, 89; Senate Ex. Doc. No. 56, 40th Cong., 2d sess., 10), and it was covered into the Treasury as money derived from abandoned or captured property. On the part of Congress, with the most specific information twice placed before them in response to their inquiries, no new disposition of the fund was made, no *567 new statute in regard to it framed, and no statutory directions given requiring judicial proceedings to be instituted against it. And when Congress passed tbe Joint resolution 30th May, 186S (15 Stat., L., 251), directing tbat tbe proceeds of captured property be covered into tbe Treasury, and tbe Acts 2oth June, 1868, 27th July, 1868 (id., 75, 8; 243, § 1, 3), ratifying the acts of officers “ done during tbe rebellion” under color of office, and making exclusive tbe remedy in this court in favor of tbe owners of captured property, no discrimination was made against this particular fund. On tbe part of this court, it was held in Jenkins’s Case (8 0. Cls. R., 464), in 1873, tbat this identical money formed a part of the general fund and tbat tbe owner was on titled to relief under the statute; and tbe government left tbe decision unquestioned by an appeal. Thus tbe three branches of the government from tbe first believed and assumed tbat it was tbe purpose of the act in addition, 2d July, 1864, to gather up all outlying captures of property which had not then passed to judicial condemnation and place them within the operation of tbe abandoned or captured property act as completely as if tbat act bad been enacted on tbe 13th July, 1861, instead of on the 12th March, 1863. At this day, when nearly every claim upon tbe fund has been disposed of, it seems altogether too late to examine the question as res novo, and tbe recent decision of tbe Supreme Court in tbe cases of Pugh and Winchester (present term) authoritatively hold that a construction which has been so long acted upon and acquiesced in should not now be disturbed.
. The only perceptible ground on which to escape from the foregoing conclusion is tbat taken by the Assistant Attorney - G-eneral upon tbe argument, viz, that this property, which came to the possession of the government in 1861, was neither forfeit-able within tbe meaning of the one statute (1861) nor held for the benefit of loyal owners within tbe meaning of tbe other (1863), and that it must be regarded as booty within the rule of international warfare. • It would seem a sufficient answer to the proposition that the government most cabefully refrained from exercising that rigorous prerogative of a belligerent during the late civil war. But be that as it may, it appears in this case that the commanding officer, who represented the government, ■when he took possession of the district of country around Port Royal, prior to the capture of the claimant’s cotton, issued a proclamation, in which he assured to tbe inhabitants safety in *568 person ancl property. We regard tbe proclamation of General Sbermau as decisive of the claimant’s right of property, and we give to it the same effect which the Supreme Court gave to the proclamation of General Butler in the case of The Venice (2 Wall, 259), or which the same tribunal gave to the proclama-lamation of the President in the case of Padelford (9 Wall., 531).
Finally, in neither the action of the government, nor in the legislation of Congress, nor in the decisions of the judiciary do we find a reason for saying that there is now a large nondescript fund in the Treasury which is neither the fruit of judicial forfeiture and condemnation nor the proceeds of abandoned and captured property as known to the statute. Whatever doubts once existed in the mind of the court, recent investigation has set at rest. We are now fully satisfied that Congress intended by the act in addition, 2d July, 1864, to bring all funds derived from abandoned or captured property not disposed of by judicial proceedings under other statutes within the operation of the abandonded or captured property act.
The judgment of the court is that the claimant recover the proceeds in the Treasury of eighteen bales of cotton, at $161.25 per bale,- amounting in the aggregate to $2,902.50.
Draice, Oh. J., was absent when this case was heard, and took no part in the decision.