Robert O. GILMORE, Jr., and Inmates of San Quentin State Prison, Plaintiffs–Appellants,

United States of America, Intervenor,

v.

PEOPLE OF THE STATE OF CALIFORNIA, Defendant–Appellee.

Maurice Thompson; Charles A. Green; John Gzikowski; Keith D. Williams; Ronald E. Lanphear; Chol Soo Lee; Andrew E. Robertson, individually and on behalf of others similarly situated, Plaintiffs–Appellants,

v.

Jiro J. Enomoto, (former Director, California Department of Corrections; current Director James Rowland); George W. Sumner, Warden, California State Prison at San Quentin, Defendants–Appellees.

Nos. 98–15160, 98–15198.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1999

Filed Aug. 4, 2000

In Gilmore v. California: Donald Specter, Prison Law Office, San Quentin, California, for the plaintiffs-appellants.

Dianne de Kercor, Deputy Attorney General, San Francisco, California, for the defendants-appellees.

In Thompson v. Gomez: Donald Specter, Prison Law Office, San Quentin, California, for the plaintiffs-appellants.

1. The Honorable Myron Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

2. See Taylor v. United States, 143 F.3d 1178 (9th Cir.1998) (holding that termination provisions violate separation of powers principles), overruled by, 181 F.3d 1017 (9th Cir. 1999) (en banc) (reversing panel decision on grounds that the motion to terminate was moot).

3. See Berwanger v. Cottey, 178 F.3d 834 (7th Cir.1999) (termination provisions are consti-

Dianne de Kercor, Deputy Attorney General, San Francisco, California, for the defendants-appellees.

Appeals from the United States District Court for the Northern District of California Susan Illston and Charles A. Legge, District Judges, Presiding. D.C. Nos. CV–66–45878–SI, CV–79–01630–CAL.

Before: BRIGHT,[1] FLETCHER and THOMPSON, Circuit Judges.

FLETCHER, Circuit Judge:

In these consolidated appeals, we are asked to determine the constitutionality of provisions of the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. 104–134, 110 Stat. 1321–66 (Apr. 26, 1996), that require termination of prospective relief in prison conditions cases. This is not the first occasion we have had to address the constitutionality of these provisions,[2] nor are we the first circuit to be presented with this question.[3] Although we follow our sister circuits in holding the termination provisions constitutional, we do so on grounds that are at once less sweeping a deviation from prior case law on the equitable discretion of courts in prison conditions litigation, and closer, we believe, to the text of the statute.

I. BACKGROUND AND PROCEDURAL HISTORY

A. The Hands–Off Doctrine

In order to understand how the PLRA operates, a sense of the context from which it emerged is helpful. Litigation over prison conditions is a relatively recent

tutional); accord Imprisoned Citizens Union v. Ridge, 169 F.3d 178 (3d Cir.1999); Hadix v. Johnson, 133 F.3d 940 (6th Cir.1998); Dougan v. Singletary, 129 F.3d 1424 (11th Cir. 1997); Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649 (1st Cir.1997); Benjamin v. Jacobson, 124 F.3d 162 (2d Cir.1997), overruled by, 172 F.3d 144 (2d Cir.1999) (en banc); Gavin v. Branstad, 122 F.3d 1081 (8th Cir.1997); Plyler v. Moore, 100 F.3d 365 (4th Cir.1996).

addition to the landscape of federal jurisdiction. As one commentator has observed, "The Constitution did not breach prison walls for over 170 years. Indeed, during most of the history of this country, there was some question as to whether prisoners had any constitutional rights at all." Michael Mushlin, RIGHTS OF PRISONERS § 1.02, at 7 (2d ed.1993). According to a now renowned formulation, prisoners were mere "slaves of the state." *Ruffin v. Commonwealth,* 62 Va. (21 Gratt) 790, 796, 1871 WL 4928 (1871).[4]

Although asked to intervene on behalf of prisoners, federal courts systematically declined under the so-called "hands-off doctrine," a rule of judicial quiescence derived from federalism and separation of powers concerns. As our court once held, "it is well settled that it is not the function of the courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined." *Stroud v. Swope,* 187 F.2d 850, 851–52 (9th Cir.), *cert. denied,* 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951); *accord Sarshik v. Sanford,* 142 F.2d 676 (5th Cir.1944); *Kelly v. Dowd,* 140 F.2d 81, 82 (7th Cir.1944). And as the Supreme Court summed up the doctrine:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in the state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate

resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative branches of government.... Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled in part, Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

However, in landmark cases in the 1960's and 1970's the Supreme Court changed course, affirming the basic proposition that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country," *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and ratifying the availability of 42 U.S.C. § 1983 as a vehicle for vindicating prisoners' constitutional rights. *See Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (reversing dismissal of § 1983 claim challenging discrimination on the basis of prisoner's religious beliefs). The concept of judicial restraint was not jettisoned, just relaxed enough to permit courts to intervene in the event that prison administrators abridge fundamental constitutional rights. As the Court observed in *Procunier v. Martinez,* "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a

---

**4.** *See id.* ("The bill of rights is a declaration of general principles to govern a society of freemen, and not of convicted felons and men civilly dead.... They are slaves of the State undergoing punishment for heinous crimes

... [and] must be subject to the regulations of the institution of which they are inmates, and the laws of the State to whom their service is due in expiation of their crimes.").

prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." 416 U.S. at 405–06, 94 S.Ct. 1800 (citing *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)).[5]

In the litigation which gave rise to and followed these pronouncements on prisoners' rights,

> [c]lass-action suits by prisoners ... led the courts to the definition and enforcement of minimum standards of health care, to the establishment of minimum procedural due-process requirements for the imposition of disciplinary punishments, to the equal protection of the laws for different categories of inmates, and to the upholding of the Eighth Amendment guarantee against cruel and unusual punishments.

Norval Morris, *The Contemporary Prison: 1865–Present, in* THE OXFORD HISTO-RY OF THE PRISON 245 (Norval Morris & David J. Rothman eds., 1995); *see also Wolff*, 418 U.S. at 556, 94 S.Ct. 2963 (citing decisions recognizing rights of religious freedom under the First and Fourteenth Amendments, right of access to the courts under the Due Process Clause, protection against racial discrimination under the Equal Protection Clause, and other due process rights). And prison conditions undoubtedly have improved as a result.[6]

### B. *Gilmore*

The *Gilmore* case is among the first generation of prison conditions cases in which the Supreme Court recognized and enforced minimum constitutional guarantees in the prison setting. The case began as a consolidation of numerous actions filed by prisoners in facilities administered by the California Department of Corrections ("CDC"). *See Gilmore v. Lynch*, 319 F.Supp. 105, n. * (N.D.Cal.1970) (citing 25

---

**5.** Even as the Court recognized that prisoners' constitutional rights must be protected, it hastened to add that "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff*, 418 U.S. at 556, 94 S.Ct. 2963; *see also Turner v. Safley*, 482 U.S. 78, 87, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (out of deference to prison administrators courts apply a form of rational basis review in prisoners' rights cases, asking "whether a prison regulation that burdens fundamental rights is 'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns"); *id.* at 85, 107 S.Ct. 2254 (in prison administration "separation of powers concerns counsel a policy of judicial restraint").

**6.** *See, e.g., Hutto v. Finney*, 437 U.S. 678, 681–83 & notes, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1979) (describing successful constitutional challenges to use of hand-cranked device for administering electrical shocks "to various sensitive parts of an inmate's body," lashings with four inch wide leather strap, "uncontrolled" rape, pervasive use of inmates as armed guards authorized to use deadly force, and feeding adult male prisoners in isolation less than 1,000 calories a day in the form of "4-inch squares of 'grue,' a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste and baking the mixture in a pan," in Arkansas penal system); *Johnson v. Dye*, 175 F.2d 250, 256 & n. 11 (3d Cir.) (granting habeas petition of African American prisoner who escaped Georgia chain gang on grounds that treatment in the chain gangs was cruel and unusual punishment; "We shall not set out in this opinion the revolting barbarities which Johnson and his witnesses state were habitually perpetrated as standard chain gang practice. To perpetrate these atrocities in an opinion is to be unfair to the American scene as a whole and to reflect little credit on this generation for posterity. It is enough to state that leg-irons and most frequent beatings were among the 'minor' constant cruelties."), *rev'd*, 338 U.S. 864, 70 S.Ct. 146, 94 L.Ed. 530 (1949); *Ex parte Pickens*, 101 F.Supp. 285, 287 (D.Alaska 1951) (denying habeas petition of pretrial detainee held with 35 other pretrial detainees and four prisoners in a 27 foot square single room cell despite finding that "the place is not fit for human habitation and to crowd into this room so many prisoners at once well justifies the comment of representatives of the health service of the Federal Government who referred to it as a 'fabulous obscenity' "); *see also, Miller v. French*, —— U.S. ——, 120 S.Ct. 2246, 2262–64, 147 L.Ed.2d 326 (2000) (Breyer, J., dissenting) (detailing history of litigation aimed at improving "barbaric and shocking" prison conditions in Puerto Rico prisons).

consolidated cases), *on remand from, Gilmore v. Lynch,* 400 F.2d 228, 231 (9th Cir.1968) (reversing district court's determination that case did not present substantial question of constitutional law requiring consideration by three-judge court under 28 U.S.C. § 2281). Collectively, the prisoners challenged regulations of the CDC restricting access to law books, legal materials, and lay assistance in preparing filings. Against the state attorney general's assertion that "the provision of law books in prison libraries is a matter of governmental grace, i.e., a privilege to be withheld or conditioned as the State chooses," plaintiffs claimed that the regulations "den[ied] indigent prisoners, and their jailhouse lawyers, the legal expertise which is necessary if access to the courts by these persons is to be in any way meaningful." *Gilmore,* 319 F.Supp. at 108.

Observing that the due process right of reasonable access to the courts "encompasses all the means a defendant or petitioner might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him," the court found that the CDC regulations "offer meager fare to a criminal lawyer." *Id.* at 110. As the court elaborated:

> There are no annotated codes, no United States Reports, no Federal Reports, no California Reports. There are unannotated versions of four of California's codes, but there is no copy of any part of the United States Code. There are copies of the rules of [sic] California and certain federal courts, but there is no edition of the Rules of the Federal District Courts which receive a great many of the habeas corpus petitions, and all of the civil rights petitions, filed by California prisoners. There is one copy of Witkin's treatise on California criminal procedure, but there are no other law books or journals . . . on the list.

*Id.; see also id.* at 107 n. 2 (noting that the regulation ordered "all existing law books and references in inmate law libraries not consistent with [the exclusive list] removed and destroyed"). The court flatly rejected the state's argument that a prisoner need only "file a brief statement of the facts of his case" in order to effectively obtain access to the courts:

> The wording of the statute and the wishes of scholars notwithstanding, this Court takes notice that more than simple "facts" are needed in order to file an adequate petition for relief by way of habeas corpus. A prisoner should know the rules concerning venue, jurisdiction, exhaustion of remedies, and proper parties respondent. He should know which facts are legally significant, and merit presentation to the Court, and which are irrelevant or confusing. When the Return is filed, it is never without abundant citations to legal authority, and a proper traverse must take cognizance of these points. No attorney filing a habeas petition omits a statement of points and authorities, and neither does the State's attorney in responding to one. . . . *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), makes it clear that some provision must be made to ensure that prisoners have the assistance necessary to file petitions and complaints which will in fact be fully considered by the courts.

*Id.* at 110; *see also id.* at 109 (citing cases recognizing equal protection right of indigent and uneducated prisoners "to the tools necessary to receive adequate hearing in the courts").

Having found the restrictive list of prison library books constitutionally deficient, the court observed that the alternatives open to the state to protect prisoners' right of access "are legion." *Id.* at 110 (noting that state could authorize public defenders to assist in collateral proceedings or initiate a legal aid program with law students and professors). The court also carefully noted that its broad equitable discretion to shape an appropriate remedy was counterbalanced by the requirement of deference to prison administrators. *Id.* at 112 ("[J]udges have always feared to rush in where correctional officials are presumed more fit to tread.").

Thus the court enjoined the enforcement of the regulation implementing the restrictive list of books, but it declined to

> undertake the task of devising another system whereby indigent prisoners are given adequate means of obtaining the legal expertise necessary to obtain judicial consideration of alleged grievances cognizable by the courts. The Department of Corrections will, therefore, decide whether to expand the present list of basic codes and references in the manner suggested by this opinion, or whether to adopt some new method of satisfying the legal needs of its charges.

*Id.*

The Supreme Court affirmed in a summary opinion, *see Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (citing *Johnson v. Avery* ), and on remand, the state elected to supplement its prison libraries rather than develop a new scheme for ensuring access to the courts. The CDC promulgated and filed with the court proposed regulations offering a more comprehensive list of materials. On October 16, 1972, after hearing plaintiffs' objections, the court approved the proposed regulations and ordered their adoption. *Gilmore v. Lynch,* No. 45878, Order Directing Adoption of Regulations to Implement Previous Order Granting Relief, at 2 (N.D.Cal. Oct. 16, 1972) (the "1972 Order") (finding that "Plaintiffs have not met their burden of showing that the proposed regulations are so inadequate that their approval would result in a continued denial to prisoners of their constitutional right to access to the courts"). The order closed by noting that, once defendants certified that the regulations were implemented, the court would "entertain a motion to enter a final order in this matter as a three-judge District Court, leaving determination of other issues in the case for a single judge." *Id.* at 5.

Four years later the state filed a memorandum of compliance with the 1972 Order. Defs' Mem. of Compliance with Oct. 13, 1976 Order (filed Sept. 7, 1976). Conceding that "[p]rior to the court order, there was virtually no law material in most libraries [and that what] was on hand was usually old, dated and of little value," the memorandum detailed extensive modifications in the libraries' collections, circulation practices and rules for inmate access. *Id.* at 3. In 1977, frustrated with plaintiffs' failure to prosecute the remaining individual causes of action, the district court denied plaintiffs leave to amend the complaint and ordered plaintiffs' counsel to "prepare a final judgment encompassing the complete results of this action...." Order Granting Defs' Mtn. to Dismiss (August 25, 1977). On September 28, 1979, following negotiations regarding attorney's fees, the district court ordered defendants to pay plaintiffs' counsel a sum certain and stated:

> This action shall be dismissed. Upon satisfactory payment of said fee, judgment shall be entered, subject to the right of plaintiffs to file a petition with this Court to seek enforcement with the provision of this Court's order of October 16, 1972.

Order Settling and Dismissing Action (Sept. 28, 1979). Six months later the court dismissed the action with prejudice.

There was no further action in the case for seventeen years—the CDC presumably maintained its libraries in accordance with the 1972 Order. In July 1997, however, the Deputy Director of the Institutions Division of the CDC circulated a memorandum to the library staff ordering them to "delay the processing of orders for updating the current collection," and to process "only those orders for lawbooks on the attached list." The memo added that, in view of *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the CDC planned to change existing regulations regarding the law libraries and to create "a new law library collection which will be different and smaller than the current collection." The list attached to the memo deviated sharply from the list of books required to be kept current under the 1972 Order. Most prominently, the list provided for no annotated state or federal codes and no case reporters.

Two days after the memo, defendants filed a motion to terminate "the 1972 Order and other supplemental orders entered in this action" pursuant to the termination provisions of the PLRA.[7] The district court upheld the constitutionality of the Act, declined to conduct an evidentiary hearing on current conditions in the libraries and terminated the 1972 Order.

As a case in which the substantive constitutional violation was fully adjudicated, and the remedy chosen and implemented by the CDC without protest or post-judgment supervision/modification, *Gilmore* differs markedly from *Thompson.*

## C. *Thompson*

*Thompson* is one of the lingering second and third generation prison conditions cases which appear to have occupied Congress' attention in drafting the termination provisions of the PLRA. In the later cases, prison administrators generally elected to enter consent decrees rather than litigate the alleged constitutional violations. *See supra,* notes 2 and 3 (citing cases involving comprehensive consent decrees). In these negotiated decrees, prison administrators frequently agreed to wide-ranging changes in prison practices that exceeded the constitutional minimum. Moreover, since courts are bound to enforce the terms of the decrees (indeed, this is the key distinction between a private settlement and a consent judgment), courts have often exercised continuing supervision over prisons subject to the decrees. The courts' supervision has been especially "hands-on"—

e.g., appointing special masters, imposing sanctions for contempt, and modifying or expanding the relief provided by the decrees—where prison administrators have failed to·effectuate the terms of the decrees.

*Thompson* is a quintessential continuing supervision case. It began as a class action in 1979 by condemned inmates at San Quentin State Prison. Plaintiffs claimed that automatic confinement to administrative segregation constituted cruel and unusual punishment, violated their First Amendment right to the free exercise of religion, and abridged each prisoner's right to an individualized assessment of his or her security risk. (By CDC regulation, prisoners in the general population could only be confined to administrative segregation for violating prison rules or posing an inherent threat to institutional security.)

A year later, the parties entered, and the court approved, a comprehensive consent decree. *Thompson v. Enomoto,* No. 79–1630–SAW, Consent Decree (Oct. 23, 1980). The decree covered a wide range of issues including procedures for classifying death row inmates according to their security risk, procedures for changing an inmate's classification, out-of-cell activities and schedules, and access to legal materials.[8] Anticipating a quick transition to full compliance, the court reserved its jurisdiction for one year, adding that "[a]t the end of one year from the date of this decree, by which time the terms of this decree shall have been implemented, this section shall be dismissed in its entirety." *Id.* at 2.

---

7. The scope of the motion to terminate, and the fact that the district court explicitly retained jurisdiction to enforce the 1972 Order, establish that defendants' termination request is not moot within the meaning of *Taylor v. United States,* 181 F.3d at 1022–23.

8. The decree established a three-tiered classification system. "Grade A" prisoners, who were not violent or escape risks, would be allowed contact visits and out of cell time comparable to that provided to the general population. "Grade B" prisoners, who were violent or escape risks, would be afforded the

same privileges as inmates in maximum security administrative segregation. "Walk alones," who would be Grade A's but for the need to separate them from other prisoners for their own protection, would be afforded as much of the Grade A privileges as possible. The decree also established a schedule for outdoor exercise, required improvements in the exercise equipment, showers, meals, cell accommodations, medical treatment, and access to legal materials, and permitted Grade A prisoners privileges such as canteen access, education programs, hobbycraft items, and group religious services.

Due to population increases in the North Segregation Unit, where all the condemned inmates had been housed, some inmates had to be relocated to areas where the prison was unable to provide the full range of privileges granted by the decree. Thus in 1982, the court granted a six month extension of jurisdiction to give prison administrators time to come into compliance. When the prison failed to meet the timetable, plaintiffs moved for a contempt order which the district court denied on the grounds that defendants had been reasonably diligent and the unforeseen circumstance of increased population caused the problem. *See Thompson v. Enomoto*, 542 F.Supp. 768, 769–70 (N.D.Cal.1982). Instead, the court ordered modification of the decree, and directed the parties to negotiate a proposal. *Id.* at 770.[9]

When the parties' negotiations foundered, plaintiffs moved the court to appoint a special master pursuant to Rule 53 of the Federal Rules of Civil Procedure. The court granted plaintiffs' motion and, in 1985, appointed a "Monitor" along with an order of reference conferring broad discovery powers and indicating that, absent an objection or clear error, the Monitor's reports would be accepted as the findings of fact and conclusions of law of the court. On appeal, we held that the consent decree implicitly contemplated the appointment of a special master because the court retained authority to establish procedures for ensuring compliance with the decree. *See Thompson v. Enomoto*, 815 F.2d 1323, 1327 (9th Cir.1987).

Over the next decade, the Monitor filed six reports, several of which found prison conditions in violation of the decree. The consent decree itself was modified on two occasions (once to give prisoners access to free weights and electronic typewriters in exchange for greater latitude in restraining prisoners outside death row, and once to expand law library access, incorporate noise protections and restrict Grade B prisoner privileges). *See Thompson v. Enomoto*, 915 F.2d 1383, 1386–90 (9th Cir. 1990) (describing First through Fourth Monitor's reports and upholding district court's decision approving modifications and refusing to vacate decree). In the Sixth Report, a one hundred page document, the Monitor found that prison officials were violating a number of decree provisions, most prominently: (1) housing non-condemned administrative segregation inmates along with Grade A condemned prisoners (a practice that caused violence and disciplinary problems), (2) the use of "strip-cells" as a disciplinary measure (i.e., confining inmates to cells containing only a "strong-blanket" in nothing but their undershorts); and (3) seriously inadequate access to legal materials.

After the district court adopted the Sixth Report and denied another request by defendants to modify the decree, defendants moved to terminate the decree under the PLRA. The court granted the motion over plaintiffs' objections on constitutional grounds. *See Thompson v. Gomez*, 993 F.Supp. 749 (N.D.Cal.1997).

The PLRA's restrictions on granting and maintaining prospective relief came largely in response to cases similar to *Thompson*. The sponsors of the Act decried "overzealous Federal courts ... micromanaging our Nation's prisons," 141 Cong. Rec. S14418 (daily ed. Sept 27, 1995) (remarks of Sen. Hatch), and "judicial orders entered under Federal law [which] have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts." *Id.* at S14419 (remarks of Sen. Abraham).[10] From these and other

---

**9.** In the interim, the court found defendants in contempt for violating inmates' visitation rights.

**10.** Senator Abraham continued:
Under a series of judicial decrees resulting from Justice Department suits against the Michigan Department of Corrections, the Federal courts now monitor our State prisons to determine: First, how warm the food is; second, how bright the lights are; third, whether there are electrical outlets in each cell; fourth, whether windows are inspected and up to code; fifth, whether prisoners'

pronouncements, it is clear that Congress intended the PLRA to revive the hands-off doctrine.[11] How extensive the revival and whether the Constitution was breached in the process are questions to which we now turn.

## II. STANDARD OF REVIEW

 The interpretation and construction of statutes are reviewed de novo. *Gilbrook v. City of Westminster,* 177 F.3d 839, 872 (9th Cir.1999); *Tierney v. Kupers,* 128 F.3d 1310, 1311 (9th Cir.1997). Constitutional issues are also reviewed de novo. *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1382 (9th Cir.1998).

## III. DISCUSSION

Plaintiffs' challenge to the PLRA's termination provisions is fourfold. First, they argue that the termination provisions violate separation of powers because the provisions (a) reopen and mandate the termination of final judgments, *see Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), and (b) prescribe a rule of decision for the courts. *See United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). Second, plaintiffs contend that the termination provisions violate their vested due process

rights by terminating relief provided by contract and court order. Third, plaintiffs claim that the termination provisions deny prisoners equal protection of the laws by singling out prisoners and burdening their right of access to the courts. Finally, plaintiffs argue that the district courts erred by refusing to grant evidentiary hearings to determine whether there is any current and ongoing violation of federal rights in the prisons.

## A. The Termination Provisions

 Each of these claims requires a careful analysis of the termination provisions. In undertaking this analysis, we are especially mindful of the guiding principle that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909), *quoted and followed in, Jones v. United States,* —— U.S. ——, —— – ——, 120 S.Ct. 1904, 1911, 146 L.Ed.2d 902 (2000).[12] As the Supreme Court has recognized, this is a longstanding principle of statutory construction:

---

hair is cut only by licensed barbers; and sixth ... whether air and water temperatures are comfortable.

This would be bad enough if a court had ever found that Michigan's prison system was at some point in violation of the Constitution, or if conditions there had been inhumane. But that is not the case.... Rather, the judicial intervention is the result of a consent decree that Michigan entered into in 1982—13 years ago—that was supposed to end a lawsuit filed at the same time. Instead, the decree has been a source of continuous litigation and intervention by the court into the minutia of prison operations.

*Id.*

11. *See, e.g.,* H.R. REP. NO. 104–378, at 166 (1995) ("[The PLRA] amends 18 U.S.C. § 3626 to require that prison conditions remedies do not go beyond the measures necessary to remedy federal rights violations and that public safety and criminal justice needs

are given appropriate weight in framing such remedies. Specifically, the section places limits on the type of prospective relief available to inmate litigants. *The relief is generally limited to the minimum necessary to correct the violation of a federal right."*) (emphasis added); H.R. REP. No. 104–21, at 24 n. 2 (1995) ("By requiring courts to grant or approve relief constituting the least intrusive means of curing an actual violation of a federal right, the provision stops judges from imposing remedies intended to effect an overall modernization of local prison systems or provide an overall improvement in prison conditions. The provision limits remedies to those necessary to remedy the proven violation of federal rights.").

12. We are also mindful of the principle that a statute should not be construed to displace courts' traditional equitable powers "[a]bsent the clearest command to the contrary." *Califano v. Yamasaki,* 442 U.S. 682, 705, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. The Charming Betsy,* 2 Cranch 64, 2 L.Ed. 208 (1804), and has for so long been applied by this Court that it is beyond debate.... This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.

*DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (citations omitted); *see also NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available."); *Blodgett v. Holden,* 275 U.S. 142, 147–48, 48 S.Ct. 105, 72 L.Ed. 206 (1928) ("Even to avoid a serious doubt the rule is the same."); *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.").

■ The principle is mitigated only by the equally important rule that "avoidance of a difficulty will not be pressed to the point of disingenuous evasion." *George Moore Ice Cream Co., Inc. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933). As the Supreme Court recently noted in upholding the PLRA's automatic stay provisions, "where Congress has made its intent clear, 'we must give effect to that intent.'" *Miller v. French,* —— U.S. ——, 120 S.Ct. 2246, 2253, 147 L.Ed.2d 326 (2000) (rejecting a "saving" interpretation of automatic stay provisions because it "would subvert the plain meaning of the statute");[13] *see also Rust v. Sullivan,* 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 841, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).

■ The PLRA establishes a comprehensive set of standards to govern prospective relief in prison conditions cases. Section 3626(a)(1) of Title 18 provides that prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). Thus a district court faced with a prison conditions suit may not grant or approve prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* The provision closes by requiring courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief," *id.,* and by limiting courts' power to grant preliminary injunctive relief, 18 U.S.C. § 3626(a)(2), or to release prisoners as a sanction for failure to comply with other relief. 18 U.S.C. § 3626(a)(3).[14]

---

13. We note that although the *French* Court discussed the termination provisions, it did not reach the question of their constitutionality. *See id.* at ——, 120 S.Ct. at 2258 ("We note that the constitutionality of § 3626(b) *is not challenged here;* we assume *without deciding,* that the new standards it pronounces are effective.") (emphasis added). Thus while we make reference to the analysis in *French,* it does not control the outcome of this case.

14. Sponsors of the PLRA were especially concerned with courts setting "population caps" and ordering the release of inmates as a sanction for prison administrators' failure to comply with the terms of consent decrees designed to eliminate overcrowding:

> The second major section of the [PLRA] establishes some tough new guidelines for Federal courts when evaluating legal challenges to prison conditions. These guidelines will work to restrain liberal Federal judges who see violations o[f] constitutional rights in every prisoner complaint and who

Section 3626(a) therefore operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators— no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum.

If prospective relief has already been granted by a court, § 3626(b) controls. According to subsection (1) of § 3626(b), prospective relief is

> terminable upon the motion of any party or intervener (i) 2 years after the date the court granted or approved the prospective relief; (ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or (iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after the date of enactment.

18 U.S.C. § 3626(b)(1). Thus, any prospective relief becomes terminable, at the latest, two years after its imposition.

Section 3626(b)(2) goes further, setting forth a retroactive standard for *immediate* termination of prospective relief where the conditions of § 3626(b)(3) are not met:

> (2) Immediate termination of prospective relief.—In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive

> means necessary to correct the violation of the Federal right.
>
> (3) Limitation.—Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(2) & (b). According to these provisions, then, any "prospective relief" that exceeds the constitutional minimum must be terminated regardless of when it was granted.[15]

The statute defines "prospective relief" as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). "Relief," in turn, is "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlements." 18 U.S.C. § 3626(g)(9). "Consent decree" is also a defined term in the statute. It means "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements." 18 U.S.C. § 3626(g)(1).

### B. Separation of Powers

▮ Two things are immediately apparent from the plain language of § 3626(b) and its defined terms for separation of power purposes. First, § 3626(b)(2) mandates only the termination of prospective relief, it does not

---

have used these complaints to micromanage State and local prison systems.

Perhaps the most pernicious form of micromanagement is the so-called prison population cap. In 1993, for example, the State of Florida put 20,000 prisoners on early release because of a prison cap order issued by a Federal judge who thought the Florida system was overcrowded and thereby inflicted cruel and unusual punishment on the State's prisoners. And then there's the case of Philadelphia, where a court-ordered prison cap has put thousands of violent criminals back on the city's streets, often with disastrous consequences....

By establishing tough new conditions that a Federal court must meet before issuing a prison cap order, this bill will slam-shut the revolving prison door.

141 Cong. Rec. S14414 (daily ed. Sept. 27, 1995) (remarks of Sen. Dole).

**15.** *See* Pub.L. 104–134, Title I § 101, 110 Stat. 1321–70 (Apr. 26, 1996) ("Section 3626 of title 18, United States Code, as amended by this section, shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title.").

require a court to terminate or vacate the underlying final judgment (typically a consent decree) which provides for such relief. Second, reading § 3626(b)(2) along with the limiting provision in § 3626(b)(3), any relief that was narrowly tailored in the first instance, and extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right, is not terminable. A district court is bound to maintain or modify any form of relief necessary to correct a current and ongoing violation of a federal right, so long as that relief is limited to enforcing the constitutional minimum. In short, final judgments are not undone and all of the courts' traditional equitable powers not expressly revoked are retained. So construed, the termination provisions do not impinge on the separation of powers.

### 1. Terminating Final Judgments

Many of the courts to rule on the termination provisions have concluded that the statute requires nothing less than the termination of consent decrees, and have then proceeded to address the grave constitutional question whether Congress can command the courts retroactively to terminate a final judgment. *See Dougan*, 129 F.3d at 1425–26 ("Section 3626(b)(2) requires a court to terminate 'prospective relief,' which includes existing consent de-

crees.... The consent decrees that the PLRA requires courts to review under the statute's more stringent standards are not final judgments for separation-of-powers purposes."); *Rouse*, 129 F.3d at 654–55 ("[O]nce defendants or intervenors show their entitlement to terminate prospective relief, the Act seemingly requires termination of the consent decree itself.... We are therefore duty bound to interpret the PLRA as mandating the termination of extant consent decrees altogether...."); *Gavin*, 122 F.3d at 1084, 1087 (" 'Prospective relief' is defined broadly to include all relief other than compensatory damages; it expressly includes consent decrees.... In a continuing case, a consent decree is not the 'last word' of the courts in the case, even after the decree has become final for purposes of appeal. Rather a consent decree is an executory form of relief that remains subject to later developments."); *Plyler*, 100 F.3d at 369, 371 (same); *see also Imprisoned Citizens*, 169 F.3d at 182 (section 3626(b)(2) requires a court to "terminate jurisdiction").[16]

Although the statute does define "relief" to include "consent decrees," it defines "consent decree" narrowly. Our sister circuits have not attended to this narrow definition in their construction of the termination provisions. *See id.* In its ordinary usage, a consent decree is both a contract of settlement and a final judgment.[17] Thus, although it provides for in-

**16.** The view of Judge Calabresi of the Second Circuit is in sharp contrast. *See Benjamin*, 172 F.3d at 174 (Calabresi, J., concurring) ("[T]here is nothing .... that indicates that Congress meant to infringe on an existing judgment of the courts, rather than merely to change the underlying law, so that the courts would reach the same ultimate result by modifying the effect of their own prior rulings."); *id.* at 189–90 ("[T]he PLRA does not terminate the consent decrees themselves but only ends future relief ... under them."). The majority in *Benjamin* stakes out a middle position—holding that while the act unquestionably requires termination of consent decrees, it does not mandate vacatur. *See id.* at 159 (majority opinion) (" 'While terminating a consent decree strips it of future potency, the decree's past puissance is preserved and certain of its collateral effects may endure. Va-

cating a consent decree, however, wipes the slate clean, not only rendering the decree sterile for future purposes, but also eviscerating any collateral effects and, indeed, casting a shadow on past actions taken under the decree's imprimatur.... [N]othing in the PLRA even hints that consent decrees must be vacated when prospective relief is terminated.' ") (quoting *Rouse*, 129 F.3d at 662).

Although we agree with Judge Calabresi that the statute must be read to reach only prospective relief, and not the underlying judgment which provides the relief, as the discussion below reveals, we believe this conclusion flows from the plain terms of the statute.

**17.** As the Supreme Court has said:

To be sure, consent decrees bear some of the earmarks of judgments entered after

junctive relief according to terms agreed to by the parties,[18] a consent decree is not *merely* a form of relief. The PLRA, however, defines a "consent decree" exclusively in terms of the relief it provides; specifically, the statute states that " 'consent decree' means any *relief* entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlement agreements." 18 U.S.C. § 3626(g)(1) (emphasis added).[19]

We are bound to give effect to this explicit statutory definition even though it deviates from common usage. *See Meese v. Keene*, 481 U.S. 465, 484–85, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Western Union Tel. Co. v. Lenroot*, 323 U.S. 490, 502, 65 S.Ct. 335, 89 L.Ed. 414 (1945). Read-

ing the statute as such, the termination provisions do not require the termination of consent decrees or any other final judgments of Article III courts. The provisions apply exclusively to prospective relief, limiting the scope of federal jurisdiction to enforce the prospective aspect of final judgments in prison conditions cases.

Under this saving construction, the separation of powers question is relatively straightforward—namely, whether Congress may set a new and retroactively applicable standard for obtaining relief from final judgments which impose forward-looking injunctive remedies. This, Congress certainly may do. Although *Plaut* stands for the proposition that Congress may not enact "retroactive legislation requiring an Article III court to set

---

litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts. More accurately, then, as we have previously recognized, consent decrees "have attributes both of contracts and of judicial decrees," a dual character that has resulted in different treatment for different purposes.

*Local Number 93, Int'l Ass'n of Firefighters v. Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (citations omitted) (quoting *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975)); *see also Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.") (citing *Railway Employees v. Wright,* 364 U.S. 642, 650–51, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)).

The case law of our circuit is in accord. *See, e.g., Smith v. Sumner,* 994 F.2d 1401, 1406 (9th Cir.1993) ("Consent decrees have a dual nature, reflecting the attributes of both a contract and a judicial act. Though a consent decree has judicial features, it is the parties' consent [that] animates the legal force of a consent decree.") (citations and internal quotation marks omitted); *Hook v. Arizona,* 972 F.2d 1012, 1016 (9th Cir.1992) (because it is a final judgment, "[t]he proper procedure for seeking relief from a consent decree is a Rule

60(b) motion"); *Stone v. City & County of San Francisco,* 968 F.2d 850, 861 n. 20 (9th Cir. 1992) (" 'When the defendants chose to consent to a judgment, rather than have the District Court adjudicate the merits of the plaintiffs' claims, the result was a fully enforceable federal judgment that overrides any conflicting state law or state court order. The strong policy encouraging settlement of cases requires that the terms of a consent judgment ... be respected as fully as a judgment entered after trial.' ") (quoting and following *Badgley v. Santacroce,* 800 F.2d 33, 38 (2d Cir.1986)); *Securities & Exch. Comm'n v. Randolph,* 736 F.2d 525, 528 (9th Cir.1984) ("A consent decree offers more security to the parties than a settlement agreement where the only penalty for failure to abide by the agreement is another suit. A consent decree is a judgment, has the force of res judicata, and it may be enforced by judicial sanctions, including ... citations for contempt.") (citation omitted).

18. *See Gates v. Shinn,* 98 F.3d 463, 468 (9th Cir.1996) ("The consent decree is an injunction. A judgment issued by a court in the exercise of its equitable or admiralty jurisdiction is called a decree, and when a decree commands or prohibits conduct, it is called an injunction.").

19. "Private settlement agreement" is separately defined as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." 18 U.S.C. § 3626(g)(6).

aside a final judgment," 514 U.S. at 240, 115 S.Ct. 1447, that case involved a legislative attempt to reopen the dismissal of suits for money damages under federal securities laws, and the Court was very careful to distinguish legislation that merely "alter[s] the prospective effect of injunctions entered by Article III courts." *Id.* at 232, 115 S.Ct. 1447 (citing *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856) ("*Wheeling Bridge II*"), and noting that "nothing in our holding today calls [*Wheeling Bridge II*] into question").

The legislative action at issue in *Wheeling Bridge II* is not directly analogous to the PLRA, but the case nicely demonstrates the applicable rule. In *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 54 U.S. (13 How.) 518, 14 L.Ed. 249 (1852) ("*Wheeling Bridge I*"), the Supreme Court held that a bridge across the Ohio River was an obstruction of navigation and ordered the bridge raised or removed. Congress responded by enacting legislation establishing the bridge as a post road for U.S. mail service and declaring that the bridge company was authorized to maintain the bridge at its existing height. Nature intervened and the bridge was destroyed by a storm. When the state of Pennsylvania sued to enjoin reconstruction of the bridge, it challenged the post road statute as an unconstitutional attempt to annul the Court's decision in *Wheeling Bridge I.* The bridge company prevailed on the theory that the statute merely changed the law underlying the permanent injunction granted in *Wheeling Bridge I:*

> Now, we agree, if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court. The decree before us, so far as it respect[s] the costs adjudged, stands upon the same principles, and is unaffected by the subsequent law. But that part of the

decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance. Now, whether it is a future existing or a continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the mean time, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of this court can no longer be enforced.

*Wheeling Bridge II,* 59 U.S. at 431–32.

■ Although the post road statute in *Wheeling Bridge II* directly changed the underlying substantive law (whether the bridge was an unlawful obstruction of navigation), Congress is clearly without power to modify the underlying constitutional rights at stake in prison conditions cases. Congress cannot, for instance, declare whether certain prison conditions violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See Dickerson v. United States,* —— U.S. ——, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (holding that Congress cannot overrule prophylactic remedy designed to prevent violation of constitutional rights); *id.* at ——, 120 S.Ct. at 2332 ("Congress may not legislatively supercede our decisions interpreting and applying the Constitution."); *City of Boerne v. Flores,* 521 U.S. 507, 524, 529, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ("The power to interpret the Constitution in a case or controversy remains in the judiciary.... If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be 'superior paramount law, unchangeable by ordinary means.' ") (quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)); *see also Gavin,* 122 F.3d at 1086–87. But Congress is free to alter the standard that determines the scope of prospective relief for unconstitutional prison conditions so long as the restrictions on the remedy do not prevent vindication of

the right. *See id.; see also infra*, § B.2.i & note 23. And just as in *Wheeling Bridge II*, the intervening change in the standard applies to all "continuing decrees." *See Landgraf v. USI Film Products*, 511 U.S. 244, 273, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."). Conceived therefore as a change in the "underlying law," the PLRA simply amends Rule 60(b)—the rule that otherwise governs courts' power to modify or terminate relief granted pursuant to a final judgment. As the Court put it in *French:*

> By establishing new standards for the enforcement of prospective relief in § 3626(b), Congress has altered the relevant underlying law. The PLRA has restricted courts' authority to issue and enforce prospective relief concerning prison conditions, requiring that such relief be supported by findings and precisely tailored to what is needed to remedy the violation of a federal right.... As *Plaut* and *Wheeling Bridge II* instruct, when Congress changes the law underlying a judgment awarding prospective relief, that relief is no longer enforceable to the extent it is inconsistent with the new law.

—— U.S. at ——, 120 S.Ct. at 2258 (citations omitted); *see also Rufo*, 502 U.S. at 388, 112 S.Ct. 748 ("A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law."); *Wright*, 364 U.S. at 652, 81 S.Ct. 368 ("The parties have no power to require of the court continuing enforcement of rights the statute no longer gives.").

■ A more serious question would obviously be presented under *Plaut* if we were to conclude that the termination provisions do more—i.e., that they destroy the underlying contract which is the basis of a consent decree, automatically terminate the jurisdiction of federal courts, or deprive a final judgment (whether rendered by consent or following adjudication) of any collateral effects it may have apart from the prospective relief it enforces. As Judge Calabresi noted in *Benjamin*, where a final judgment awards only prospective relief, the distinction between requiring a court to terminate such relief if certain conditions are met, and ordering a court to terminate the judgment itself, may seem trivial or formalistic. 172 F.3d at 179–80 (concurring opinion). In both cases, the court is rendered powerless to enforce a remedy it has granted. But in the latter scenario Congress impermissibly arrogates the judicial power to "say what the law is" in particular cases and controversies. *Marbury*, 5 U.S. at 177 (1803).[20] Thus, although formalistic, the distinction between changing the standard for modifying a judgment and terminating a judgment outright is seminal for purposes of separation of powers analysis. As the Supreme Court has noted in another setting:

> Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "for-

---

20. As the Court put it in *Plaut:*

> The record of history shows that the Framers crafted th[e] charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, *but to decide them,* subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that a judgment conclusively resolves the case because a judicial Power is one to render dispositive judgments. By retroactively commanding the federal courts to reopen final judg-

ments, Congress ... violate[s] this fundamental principle.

514 U.S. at 218–19, 115 S.Ct. 1447 (emphasis added) (internal quotation marks and citations omitted); *see also Rufo*, 502 U.S. at 391, 112 S.Ct. 748 ("Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires.").

malistic" in a given case … [b]ut the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.

*New York v. United States*, 505 U.S. 144, 187, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *see also Plaut*, 514 U.S. at 239, 115 S.Ct. 1447 (separation of powers is a "structural safeguard"); *Benjamin*, 172 F.3d at 180 (Calabresi, J., concurring) ("[H]ow something is done (i.e., whether a judgment is directly altered or whether the underlying law is changed in such a way as to lead the courts to modify their judgments) can be at least as important as the result that is achieved."). Without doing violence to the text or undermining Congress' intent, our reading of the termination provisions permits the conclusion that the PLRA preserves this important distinction and the allocation of powers it safeguards.

### 2. Prescribing the Rule of Decision

■ Our reading also permits the conclusion that the termination provisions do not prescribe a rule of decision within the meaning of *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). In that case, the executor of the estate of a Confederate supporter sought to recover the value of the decedent's cotton which was seized by treasury agents of the United States during the Civil War. A statute provided that recovery was available only to individuals who had not "given aid and comfort" to the confederacy. This is just what the decedent had done—he "voluntarily became the surety on the official bonds of certain officers of the rebel confederacy." 80 U.S. at 132. He received a

Presidential pardon, however, by taking an oath to support the Constitution and the union of the states, and in *United States v. Padelford*, 76 U.S. (9 Wall.) 531, 19 L.Ed. 788 (1870), the Supreme Court held that a Presidential pardon would suffice as proof that one had not given aid and comfort.

Just after the Court's decision in *Padelford*, while Klein's case was still pending on appeal to the Supreme Court, Congress attempted to reverse the holding in *Padelford*. It passed a statute providing that a pardon must be taken as conclusive proof that the pardoned person actually gave aid and comfort. *See Klein*, 80 U.S. at 144 ("The substance of this enactment is that an acceptance of a pardon, without disclaimer, shall be conclusive evidence of the acts pardoned, but shall be null and void as evidence of the rights conferred by it, both in the Court of Claims and in this court on appeal."). The Court held the statute unconstitutional on the ground that it "prescribes rules of decision to the Judicial Department of the government in cases pending before it." *Klein*, 80 U.S. at 146.[21] The Court expressly distinguished its decision in *Wheeling Bridge II*, reasoning that

[n]o arbitrary rule of decision was prescribed in that case, but the court was left to apply its ordinary rules to the new circumstances created by the act. In the case before us no new circumstances have been created by the act. But the court is forbidden to give the effect to evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary. We must think that Congress has inadvertently passed the limit which separates the legislative from the judicial power.

*Id.* at 146–47.[22]

If § 3626(b) unconditionally directed federal courts to terminate prospective re-

**21.** *See id.* ("The court is required to ascertain the existence of certain facts and thereupon to declare that its jurisdiction on appeal has ceased, by dismissing the bill. What is this but to prescribe a rule for the decision of a cause in a particular way.").

**22.** The Court was also concerned with Congress' encroachment on the President's power to grant pardons. *See id.* at 147–48 (noting that the power to pardon is entrusted to the Executive branch alone, and that the legislature "cannot change the effect of such a par-

lief in prison condition cases decided prior to the Act, it would surely run afoul of the rule in *Klein*. But, plaintiffs' protestations to one side, the Act does no such thing. The "immediate termination" made available by § 3626(b)(2) statute is not a unilateral mandate to the courts, leaving no room for adjudication, no room for the exercise of traditional equity powers. This point becomes clear by identifying the degree to which the termination provisions deviate from the general standards for granting and modifying continuing decrees.

*i. Granting a Remedy*

 As the Supreme Court long ago made clear in the school desegregation cases, although

> the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies ... it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults.... As with any equity case, *the nature of the violation determines the scope of the remedy.*

*Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (emphasis added) (approving remedies necessary to effectuate desegregation). Thus where a court seeks to correct a constitutional violation established in the course of litigation, the court's exercise of equitable discretion must heel close to the identified violation and respect "the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*"Milliken II"*) (upholding imposition of remedial education program to effectuate desegre-

don any more than the executive can change

gation decree). As the *Milliken II* Court observed:

> The well-settled principle that the nature and scope of the remedy are to be determined by the violation means that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, *federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation,* or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation.... But where, as here, a constitutional violation has been found, the remedy does not "exceed" the violation if the remedy is tailored to cure the "condition that offends the Constitution."

433 U.S. at 281–82, 97 S.Ct. 2749 (emphasis added) (citations omitted) (quoting *Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*"Milliken I"*)); *see also Rufo*, 502 U.S. at 389, 112 S.Ct. 748 ("Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated.") (citing *"Milliken II"*); *Hutto*, 437 U.S. at 687–88 & n. 9, 98 S.Ct. 2565 (upholding remedy in prison conditions case necessary to "bring an ongoing violation to an immediate halt").

 On the other hand, continuing decrees entered by consent of the parties may, precisely because of their consensual nature, provide more than the constitutional minimum:

> [W]e have no doubt that, to "save themselves the time, expense, and inevitable risk of litigation," *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), petitioners could settle the dispute over the proper remedy for the constitutional violations

a law").

that had been properly found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that) but also more than what a court would have ordered absent the settlement.

*Rufo,* 502 U.S. at 389, 112 S.Ct. 748; *see also Local Number 93,* 478 U.S. at 525, 106 S.Ct. 3063 ("[T]he consent decree must come within the general scope of the case made by the pleadings, and must further the objectives of the law upon which the complaint was based. However, in addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree. Therefore, a federal court is not necessarily barred from entering a decree merely because the decree provides broader relief than the court could have awarded after a trial.") (internal quotation marks and citations omitted).

 At least in the context of contested decrees, then, the general standard for granting prospective relief differs little from the standard set forth in § 3626(b)(2) for terminating prospective relief, or from the standard set forth in § 3626(b)(3) for preserving relief to correct a current and ongoing violation. The limits on federal court jurisdiction are essentially the same—no more than necessary to correct the underlying constitutional violation.[23] It is not immediately obvious, therefore, that prospective relief granted in a contested decree which predates the PLRA will flunk the statute's standard. District courts were already bound to follow a nearly identical standard. With respect to consent decrees, of course, any contractual surplusage (relief the court had jurisdiction to enforce only by virtue of the parties' consent) is rendered unenforceable by the termination provisions,[24] but all other relief is untouched by the statute.

### ii. Modifying the Remedy

 Rule 60(b) provides in pertinent part:

has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies.... Such provisions do, in a sense, affect the judicial power, but they are also incidental to Congress' power to define the right that it has created. No comparable justification exists, however, when the right being adjudicated is not of congressional creation. In such a situation, substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized as incidental extensions of Congress' power to define rights that it has created. Rather, such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Article III courts.

458 U.S. 50, 83–84, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion); *see also Marbury,* 5 U.S. at 163 ("The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested right.").

**23.** Sections 3626(b)(2) and (b)(3) both contain narrow language emphasizing just how closely prospective relief must track the constitutional minimum in order to survive, but Congress clearly cannot define a constitutional right out of existence by preventing courts from crafting an effective remedy. *See Rufo,* 502 U.S. at 391, 112 S.Ct. 748 (observing that "a modification must not create or perpetuate a constitutional violation"); *Swann,* 402 U.S. at 16–18, 91 S.Ct. 1267 (rejecting school district's argument that Title IV of the 1964 Civil Rights Act limited equity powers of courts where Act defined "desegregation" as " 'assignment of students to public schools and within such schools without regard to their race' ") (quoting 42 U.S.C. § 2000c(b)); *Stone,* 968 F.2d at 861 ("Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights") (citations omitted). As the Supreme Court stated in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.:*

[There is a] critical difference between rights created by federal statute and rights recognized by the Constitution.... [S]uch a distinction seems to us to be necessary in light of the delicate accommodations required by the principle of separation of powers reflected in Article III.... [W]hen Congress creates a statutory right, it clearly

**24.** *Cf. Benjamin,* 172 F.3d at 186–90 (Calabresi, J., concurring) (discussing whether consent decrees are still enforceable in state court as contracts of settlement).

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Fed.R.Civ.P. 60(b). The Rule codifies the long-established principle of equity practice that a court may, in its discretion, take cognizance of changed circumstances and relieve a party from a continuing decree. As the Supreme Court held in *United States v. Swift & Co.*:

> We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent.... Power to modify the decree was reserved by its very terms, and from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. *A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. The result is all one whether the decree has been entered after litigation or by consent.* In either event, a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changed circumstances into an instrument of wrong.

286 U.S. 106, 114–15, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (emphasis added) (citations omitted); *see also Railway Employees v. Wright,* 364 U.S. 642, 651, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961).

In *Rufo v. Inmates of Suffolk County Jail,* the Supreme Court considered the application of this rule to a prison conditions consent decree. The Court reversed the district court's conclusion that a consent decree is impervious to modification absent a showing of "'grievous wrong evoked by new and unforseen circumstances.'" 502 U.S. at 377, 112 S.Ct. 748 (quoting *Swift*). Following Rule 60(b)(5), the Court determined that the "traditional flexible standard for modification of consent decrees" applies. *Id.* at 378–79, 383–84, 112 S.Ct. 748. According to this standard, modification is warranted if there is "a significant change either in factual conditions or in law." *Id.* at 384, 112 S.Ct. 748. The court also emphasized that the burden of establishing such a change rests on the party seeking modification.

Obviously, the PLRA creates a more exacting standard for federal courts to follow. But the standard does not eviscerate a district court's equitable discretion and thereby prescribe a rule of decision. First, nothing in the termination provisions can be said to shift the burden of proof from the party seeking to terminate the prospective relief. Second, and more importantly, although § 3626(b)(2) speaks of "immediate termination," and although § 3626(e)(1) requires a "prompt" ruling, a district court cannot terminate prospective relief without determining whether the existing relief (in whole or in part) exceeds the constitutional minimum.[25] And, consistent with § 3626(b)(3), a district court can-

---

**25.** The statute directs a court to inquire whether "the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2). We do not read this to mean that explicit findings must have been made, so long as the record, the court's decision ordering prospec- tive relief, and relevant caselaw fairly disclose that the relief actually meets the § 3626(b)(2) narrow tailoring standard. Otherwise, relief which was in fact narrowly tailored would be subject to termination merely because an express finding to that effect, totally unnecessary under the law at the time of decision, was not made. A court would then be "forbidden to give the effect to evidence which, in its own judgment, such evidence should have,

not terminate or refuse to grant prospective relief necessary to correct a current and ongoing violation, so long as the relief is tailored to the constitutional minimum. Thus, unless plaintiffs do not contest defendants' showing that there is no current and ongoing violation under § 3626(b)(3), the court must inquire into current conditions at a prison before ruling on a motion to terminate. If the existing relief qualifies for termination under § 3626(b)(2), but there is a current and ongoing violation, the district court will have to modify the relief to meet the Act's standards. It is plain that each of these steps requires real adjudication—the careful application of law to fact—not the wooden ratification of a legislatively prescribed conclusion.

### C. Due Process and Equal Protection

 We pass quickly over plaintiffs' other constitutional objections. No circuit court has found the PLRA to violate due process or the Equal Protection Clause. *See supra,* notes 2 and 3. We decline to stray from these precedents.

### D. Applying the Statute

Applying our construction of the statute to the cases at bar, we conclude that the district courts erred in a number of respects.

#### 1. *Gilmore*

In *Gilmore,* the district court upheld the constitutionality of the Act, following the reasoning of the court in *Thompson v. Gomez,* 993 F.Supp. at 762–66. The court then quickly turned to two questions: (1) whether the 1972 Order adopting regulations for the prison libraries was issued in the absence of a finding that the relief provided therein was equivalent to the con-

stitutional minimum under § 3626(b)(2); and (2) "whether the court should now make 'written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation' " under § 3626(b)(3).

 Rather than place the burden on the state to show that the 1972 Order exceeded the constitutional minimum (recall that in fashioning that Order the court allowed the CDC to select its own means of ensuring inmates' access to the courts, *see Gilmore,* 319 F.Supp. at 112), the court inquired whether plaintiffs had shown that the 1972 Order was not terminable under § 3626(b)(2). Moreover, the court did not examine the court record and relief granted by the order to determine whether it was narrowly tailored and minimally intrusive—it simply asked whether explicit findings were made. We conclude that the court erred in its allocation of the burden of proof and its exclusive focus on express findings rather than on whether, in fact, the remedy exceeded the constitutional minimum according to the record and the relevant caselaw.

 The court also erred in its application of the limiting provision. The court placed the burden on plaintiffs to establish a current and ongoing violation of a Federal right rather than requiring the CDC, which had moved to terminate the decree, to prove its compliance with inmates' right of access to the courts. And although the court correctly read *Casey* to require evidence of actual injury,[26] the court denied

---

and [would be] directed to give it an effect precisely contrary." *Klein,* 80 U.S. at 147. Our reading is not a "disingenuous evasion," *Moore Ice Cream,* 289 U.S. at 379, 53 S.Ct. 620, since Congress' objective was to limit relief to the constitutional floor. *See supra,* note 11. If existing relief was so crafted according to the record and relevant caselaw, the findings required by the statute are implicit in the court's judgment.

**26.** As the Court held in *Casey:*

Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury [for purposes of standing] simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.... Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," and the inmate therefore

plaintiffs' request for an evidentiary hearing, thereby depriving plaintiffs of the chance to establish that the 1997 memo directing library staff to stop renewing books (or any other of the CDC's actions) would have a concrete effect on inmates' access to the courts.[27]

### 2. *Thompson*

In *Thompson,* plaintiffs conceded that all but four remedies granted in the con-

> must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.
>
> 518 U.S. at 351, 116 S.Ct. 2174 (quoting *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)).

**27.** Plaintiffs point to the 1997 Memo as evidence of an imminent violation of a federal right. The argument is that the 1972 Order must be preserved to prevent an imminent violation of their right of meaningful access to the courts. And insofar as § 3626(b)(3) is limited to preserving relief necessary to correct a "current *and* ongoing" violation, plaintiffs claim it violates separation of powers by preventing the courts from providing a remedy necessary to prevent reversion to past unconstitutional practices.

There can be no doubt that Congress intended to deprive courts of jurisdiction to continue relief under these circumstances. The Act was amended in 1997 specifically to preclude a court from retaining jurisdiction in the absence of a current and ongoing violation (assuming the terms of § 3626(b)(2) are also met). *See* Pub L. 105–119, § 123(a)(2), 111 Stat. 2440, 2470 (1997) (substituting "current *and* ongoing" for "current *or* ongoing"). As the Conference Report states:

> The provision also includes a change in subsection (b)(3) that corrects the confusing use of the word "or" to describe the limited circumstances when a court may continue prospective relief in prison conditions litigation to make clear that a constitutional violation must be "current and ongoing." These dual requirements are necessary to ensure that court orders *do not remain in place* on the basis of a claim that a current condition that does not violate prisoners' Federal rights nevertheless requires a court decree to address it, because the condition is somehow traceable to a prior policy that did violate Federal rights, *or that government officials are "poised" to resume a prior violation of Federal rights.* If an unlawful practice resumes or if a prisoner is in imminent danger of a constitutional violation, the prisoner has prompt and complete rem-

edies through a new action filed in State or Federal court and preliminary and injunctive relief.

H.R.Rep. No. 104–405 § 123 (1997) (emphasis added). There can also be no doubt that federal courts have always had discretion to keep injunctive orders in place where reversion to past unlawful practice is indeed imminent. *See, e.g., Casey,* 518 U.S. at 349, 116 S.Ct. 2174 ("It is the role of the courts to provide relief to claimants, in individual or class actions, who have suffered, *or will imminently suffer,* actual harm ...." ) (emphasis added); *Swift,* 286 U.S. at 119, 52 S.Ct. 460 (refusing to modify anti-trust consent decree enjoining meat packing companies from anti-competitive practices where reversion to past practices was likely; "The defendants have abused their powers so grossly and persistently as to lead to the belief that, even when they are acting separately, their conduct should be subjected to extraordinary restraints."); *see id.* (*"The difficulty of ferreting out [sporadic instances of unfair practices] and repressing them when discovered supplies an additional reason why we should leave the defendants where we find them, especially since the place where we find them is the one where they agreed to be.... We are not at liberty to reverse under the guise of readjusting."*) (emphasis added); *Stone,* 968 F.2d at 861.

Although this presents a serious separation of powers claim, we decline to reach it for the following reason. On remand, after the district court has had an opportunity to assess the CDC's current policies and practices with respect to inmate access to the courts, the evidence may show a full-blown current and ongoing violation or compliance with the constitution. In the former case, § 3626(b)(3) applies by its terms and plaintiffs would have no standing to challenge the amendment from "current or ongoing" to "current and ongoing." In the latter case, plaintiffs' claim would be moot. Thus, in view of our remand, it would be inappropriate for us to adjudicate this question now.

---

sent decree and subsequent proceedings were terminable under the PLRA. *See Thompson,* 993 F.Supp. at 755. The four remaining remedies were: (1) noise control, (2) access to legal materials, (3) the classification of prisoners, and (4) group religious services. The district court separately examined each remedy to determine whether it was either (a) supported by findings of a constitutional violation and narrowly tailored within the meaning of

§ 3626(b)(2), at the time it was granted, or (b) necessary to correct a current and ongoing violation. Relying on the existing record, the district court denied plaintiffs' request for an evidentiary hearing on present conditions at San Quentin and held that the findings were inadequate at the time each remedy was granted.

 As in *Gilmore*, the district court was required to do more than merely examine the record for "findings." If according to the record and relevant caselaw the prior orders granting relief were indeed narrowly drawn, extended no further than necessary, and were minimally intrusive, termination is improper under § 3626(b)(2). The court was further obliged to take evidence on the current circumstances at the prison as plaintiffs requested, at least with respect to those remedies as to which plaintiffs did not concede that defendants were in compliance. As the Second Circuit held in *Benjamin*, "[e]vidence presented at a prior time ... could not show a violation that is 'current and ongoing.' Hence, the 'record' referred to [in § 3626(b)(3) ] cannot mean the prior record but must mean a record reflecting conditions as of the time termination is sought." 172 F.3d at 166; *compare Cagle v. Hutto*, 177 F.3d 253, 258 (4th Cir.1999).

As to the noise remedy, the district court concluded: "The parties seem to agree that at present plaintiffs are not suffering noise levels that constitute a violation of the Eighth Amendment. Defendants have come into compliance with this term of the decree." *Thompson*, 993 F.Supp. at 757. The same can be said with respect to group religious services. The classification system, however, is different. Although the district court also indicated that plaintiffs conceded compliance with the classification system, the court focused on plaintiff's citation to the Monitor's Fourth Report. *Id.* at 760. The Sixth Report, however, states that there are serious problems with the classification system in the East Block. Therefore, the district court must assess the current con-

ditions with respect to inmate classification on remand—particularly the housing of Grade A inmates with prisoners confined to administrative segregation.

## IV. CONCLUSION

Accordingly, we REVERSE the termination of prospective relief in both cases and REMAND for further proceedings consistent with this order.

REVERSED AND REMANDED.